WILLIAM ESMAR, APPELLANT, v. W. C. HAEUSSLER AND ALBERT M. KELLER, JULIA B. RADFORD AND MERCANTILE-COMMERCE BANK AND TRUST COMPANY, EXECUTORS OF THE ESTATE OF G. A. RADFORD, RESPONDENTS.—115 S. W. (2d) 54.

St. Louis Court of Appeals. Opinion filed April 5, 1938.

*Forest P. Tralles* for respondents.

*Charles A. Lich* and *Louis L. Hicks* for appellant.

McCULLEN, J.—This suit was brought by appellant, hereinafter referred to as plaintiff, against respondents, who will be referred to sometimes as defendants and sometimes as Paul Brown & Company, to set aside an account stated and for an accounting covering transactions between the parties during the period June, 1929, and September, 1931, involving the purchase and sale of securities. A trial before the court resulted in a judgment in favor of defendants, and the dismissal of plaintiff's petition. Plaintiff took an appeal to the Supreme Court, but that court held it did not have jurisdiction and transferred the cause to this court.

The petition of plaintiff alleges that G. A. Radford, W. C. Haeussler and A. M. Keller, on and prior to July 8, 1933, were partners doing business under the firm name Paul Brown & Company, and engaged as stockbrokers with offices in St. Louis, Missouri; that, subsequent to the filing of this suit, G. A. Radford died, and that A. M. Keller, Julia B. Radford and Mercantile Commerce Bank & Trust Company had been duly appointed by the probate court of St. Louis County as executors of his estate; and that the cause of action as to defendant G. A. Radford has been revived as against the executors.

The petition alleges that in June, 1929, plaintiff employed defendants as his brokers to buy and sell securities for him on margin; that from time to time he deposited moneys with defendants, and gave orders for buying and selling stocks and securities on the New York Stock Exchange and the New York Curb; that defendants reported to plaintiff that they had bought said stocks and securities for him, but that defendants did not purchase stocks for him or in his name, but instead bought the stocks for their own account and in their name through a New York brokerage concern with whom defendants carried on a margin account; that there was no purchase of stocks for plaintiff; that the transactions reported from time to time by defendants and charged against plaintiff in his account were not valid legal purchases; and that plaintiff is entitled to an accounting.

The petition of plaintiff further alleges that, after plaintiff gave to defendants orders to buy securities for him, defendants, in every instance within a short space of time thereafter, fraudulently reported to and advised plaintiff that they had purchased for plaintiff's account and risk on the New York Stock Exchange or the New York Curb, as the case might be, the securities which plaintiff had directed defendants to buy; that plaintiff, knowing that defendants were members of the New York Stock Exchange, and being so advised by defendants, believed that defendants were purchasing and had purchased said securities on said Exchange or the New York Curb for his account; that plaintiff had just learned that he was laboring

under a mistaken understanding of the facts; and that defendants in no instance purchased said securities for him; that the orders placed by plaintiff with defendants were for execution on the New York Stock Exchange and the New York Curb, both located in the City and State of New York; that said transactions were governed by the laws of the State of New York, and by the interpretations thereof as announced by the courts of that state; that, under the case of Des Jardins v. Hotchkin, decided by the appellate division of the New York Supreme Court, 127 N. Y. Sup. 504, and affirmed by the Courts of Appeals of New York (210 N. Y. 596), the courts of New York have held and interpreted the laws of said state to such effect as to be applicable to plaintiff's cause of action herein and to entitle plaintiff to an action to open the account on the ground of fraud on the broker's part and mistake on the customer's part, on the theory that the broker's reports of the execution of orders were fictitious; and that plaintiff is thereby entitled to an equitable accounting for money he had deposited with defendants as his brokers. Plaintiff prays judgment for such sum as may be found due him from defendants.

The answer of defendants admits that G. A. Radford, W. C. Haeussler and A. M. Keller, in June, 1929, were partners in the brokerage firm of Paul Brown & Company, but denies that said defendants constituted said firm, and alleges that there were partners other than said defendants. The answer admits that Albert M. Keller, Julia B. Radford and Mercantile Commerce Bank & Trust Company had been duly appointed executors under the will of G. A. Radford, deceased, but denies they were so appointed by the Probate Court of the City of St. Louis. The answer further admits that plaintiff at one time was a customer of the brokerage firm of Paul Brown & Company; and that as brokers said firm purchased and sold for plaintiff on his order certain securities; that such securities were duly and regularly purchased and sold through the New York Stock Exchange and other exchanges in accordance with the rules and customs thereof; that all of the securities at any time purchased for plaintiff on his order were subsequently sold and delivered, and plaintiff's account fully closed and a check delivered in full payment of the amount plaintiff was entitled to receive. The answer denies that defendants failed to execute orders to buy or to sell given them by plaintiff; denies that they fraudulently reported to plaintiff the purchase or sale of securities which had not in fact been purchased and sold; and alleges that every transaction between plaintiff and the firm of Paul Brown & Company, brokers, was executed in exact accordance with plaintiff's instructions and with the rules of the exchange through which said orders were executed. The answer denies that the decision of the Appellate Court in the case of Des Jardins v. Hotchkin is a decision of the highest court of the State of New York,

or is the law of the State of New York, or that said decision in any manner affects or invalidates the transactions between plaintiff and said brokerage firm.

The reply of plaintiff is a general denial.

At the beginning of the trial, it was stipulated that, in order to avoid proving the numerous transactions appearing in the account between the parties, one transaction would be presented in evidence from its inception to its end; and that said transaction should be taken as typical of all dealings between the parties involved in this case. Said typical transaction was for the purchase of 100 shares of United Gas stock on October 15, 1930.

Sidney J. Adams was called as a witness on behalf of plaintiff, and testified that he was a member of the firm of Paul Brown & Company, brokers, and had been with the firm since January, 1929, having become a partner January 1, 1932. Plaintiff introduced in evidence a number of exhibits which were numbered from 1 to 10. Mr. Adams testified that plaintiff's exhibit 1 was a series of ledger sheets showing the account of plaintiff with Paul Brown & Company from the date it was opened in 1929 until the day it was closed in September, 1931, listing all the transactions that occurred in plaintiff's account during that time; that plaintiff's exhibit 3 represented an order, in the writing of defendants' order clerk, on Dominick & Dominick, defendants' New York correspondent, to buy 100 shares of United Gas at 10 on October 15, 1930; that it was marked for the account of plaintiff; that the order clerk gave it to the telegraph operator who wired it to Dominick & Dominick on the other end of defendants' private wire in New York.

The witness then testified that plaintiff's exhibit 2 was a message in the handwriting of defendants' telegrapher on the Dominick & Dominick wire, stating that firm had bought 100 shares of United Gas for defendants' account at $10 per share, which, including commission, totaled $1,012.50; that said message was in response to defendants' order shown in plaintiff's exhibit 3.

The witness testified that plaintiff's exhibit 4 was a notice of purchase which defendants sent on October 15, 1930, to plaintiff, advising him that they had bought for his account and risk 100 shares of United Gas at 10, and was on one of defendants' regular forms which went to all customers.

Plaintiff's exhibit 9 was shown to the witness who testified that said exhibit represented statements of Dominick & Dominick sent to defendants showing defendants' account with Dominick & Dominick dating from October 1, 1930, to October 31, 1930, and showing that the United Gas transaction occurred on October 15, 1930, and showing a debit item on October 16, 1930, in the amount of $1,006.25 debited to the account of Paul Brown & Company. The witness testified that exhibit 9 was prepared in the office of Dominick & Dominick,

and that the transactions appearing as of October 16, 1930, represented transactions of the day before; that said exhibit 9 was a statement of the account for the entire month of October between defendants, operating as Paul Brown & Company, and Dominick & Dominick, and included all the stocks bought by Paul Brown & Company during that month from Dominick & Dominick; that the 100 shares of United Gas stock, with all other stocks shown therein, were held by Dominick & Dominick as collateral for the balance owing by Paul Brown & Company to Dominick & Dominick. The witness, testifying with respect to said exhibit, stated that it showed, for example, on October 31, 1930 Paul Brown & Company had a debit balance with Dominick & Dominick of $1,735,985.78, so that on said date Paul Brown & Company owed Dominick & Dominick of New York that amount of money; that on that date Dominick & Dominick held as collateral for that amount certain stocks, but that the statement does not show the securities. The evidence shows that the 100 shares of United Gas Company stock, which were purchased on October 15, 1930, were closed out on October 21, 1930, having been held between the dates last mentioned by Dominick & Dominick with other collateral as collateral security for the balance due Dominick & Dominick on Paul Brown & Company's margin account.

Plaintiff's exhibit 5 was shown to the witness who testified that it was a message in the handwriting of defendants' order clerk to Dominick & Dominick, dated October 21, 1930, saying:

"Sell 100 United Gas new and marked cancel, 10½ open."

The witness testified that said message was transmitted to Dominick & Dominick.

Plaintiff's exhibit 6, according to the witness' testimony, was a message by the defendants' telegraph operator advising that Dominick & Dominick had sent a message stating that they had sold 100 United Gas at 9¼ and was in response to the message shown in plaintiff's exhibit 5.

Nothing appears on plaintiff's exhibit 9 to show that Dominick & Dominick had any knowledge of plaintiff's ownership of said United Gas shares. The witness testified that he was quite sure that Dominick & Dominick were not acquainted with the fact that the United Gas Company stock was to the account of Esmar, plaintiff herein; that so far as Dominick & Dominick actually knew, it was stock purchased by Paul Brown & Company for its own account; that Dominick & Dominick appear at no time to have been informed by the Paul Brown Company that said stock was purchased by Esmar, plaintiff herein, or by any of Paul Brown & Company's customers.

The witness further testified that the transactions wherein Paul Brown & Company made purchases or sales through Hutton & Company are identical and the records would be identical with the records shown pertaining to the transactions with Dominick & Dominick;

that Hutton & Company are correspondents in New York who are sometimes used by Paul Brown & Company the same as Dominick & Dominick, and that their status is identical.

Mr. Adams testified on cross-examination that he had been engaged in the brokerage business in St. Louis since 1903; that he was familiar with the usual and ordinary method of handling customers' transactions for the purchase and sale of securities on the New York Stock Exchange, and had been for the past thirty years; that the method adopted and used by Paul Brown & Company and described by him in his direct examination for the handling of such transactions was the usual and ordinary method; that on December 16, 1931, plaintiff's account was finally closed, and that all the securities entered in said account as having been purchased for plaintiff had been sold; that all purchases and sales were uniformly made on orders from plaintiff; that at the end of each month during the pendency of said account, a monthly statement showing all of the transactions was forwarded to plaintiff by Paul Brown & Company, except in those months when that company's books were audited by public accountants, at which time the accountants themselves would send them out with a request to the customer for a verification on a form of which defendants' exhibit A is one; that defendants' exhibit A is addressed to plaintiff and is as follows:

"For the purpose of assisting our auditors in making their regular examination of our books of accounts and records at the close of business, November 18, 1929, we would appreciate your verifying the position of the securities held in your account, at date mentioned, together with the balance as shown below. In making your acknowledgment, please use the attached certification and mail direct to Messrs. Ernst & Ernst, Boatmen's Bank Building, St. Louis, Mo., in the enclosed stamped envelope. Your prompt compliance will expedite the audit and be much appreciated. Yours very truly, Paul Brown & Company."

The witness then testified that the certification on said exhibit goes on to say:

"Certification. Messrs. Ernst & Ernst, Boatmen's Bank Building, St. Louis, Mo. Gentlemen: The position of the securities in my account at the close of business November 18, 1929, and the debit balance of $1,823.74 is correct."

The witness stated that said exhibit was signed on the bottom line with the signature of William Esmar, plaintiff herein. The witness further testified that from time to time similar certifications were sent to plaintiff by Ernst & Ernst and were received back from him signed by him. The witness identified three papers as such certifications. One is dated March 31, 1930; another dated December 31, 1930; and the third is dated May 31, 1931, all bearing the signature of

plaintiff and certifying to the correctness of his debit balance and his securities on hand.

Witness further testified that at the time plaintiff's account was closed, there was due him from Paul Brown & Company $1,194.62, which amount was delivered to him on September 15, 1931, in the form of a check. Said check was shown to the witness and showed that it bore the indórsement of William Esmar, plaintiff herein, and that it had cleared through the bank and had been duly paid.

Witness further testified that when a customer opens an account with Paul Brown & Company, a customer's contract is required to be signed; that when plaintiff opened his account he signed the following customer's contract:

"I hereby consent that all securities that may be purchased by Paul Brown & Company for my account and risk, which are not fully paid for by me, and any securities that are now or may be hereafter deposited by me with them as collateral to secure any advances made by them for my account, may be loaned by Paul Brown & Company or may be pledged by them, either separately or together with other securities, either for the sum due thereon to Paul Brown & Company or for any greater sum and without further notice to me. I understand that all 'phone or verbal orders are accepted at my risk. Yours very truly, William Esmar."

Plaintiff contends that all of the stocks involved herein having been purchased on the New York Stock Exchange and the New York Curb, both located in the City and State of New York, this case is to be decided under the laws of that State and under the decisions of its courts interpreting both its statutory and common law. The case of Des Jardins v. Hotchkin et al., 127 N. Y. Sup. 504, is asserted by plaintiff to be decisive of the case at bar, and he relies mainly upon that case. That case was decided by the Supreme Court, appellate divisions, an intermediate appellate court of New York State. The opinion, therefore, is not the opinion of a court of last resort of New York State, although the judgment in that case was affirmed, without opinion, by the Court of Appeals of the State of New York, which is the highest court of that State. [See 210 N. Y. 596.] The Des Jardins case, relied on by plaintiff, presents an entirely different state of facts from those appearing in evidence in the case at bar. In that case the court's opinion shows that the defendant firm represented to plaintiff therein that it had personally executed the trades for plaintiff involved therein, and claimed that it had executed plaintiff's orders through the firm of Quinlan & Company, which company could not have executed such orders because it was not a member of the New York Stock Exchange, or any other exchange. In that case the defendant brokers had their place of business in New York. They were not in the position of defendants in the case at bar, who were located in St. Louis, Missouri, and were, therefore,

required to depend on New York correspondents for the execution of orders on the New York exchanges. In the Des Jardins case, the defendants misrepresented the facts to plaintiff therein by reporting to him that they had directly executed his orders; whereas, in the case at bar the evidence shows that in each and every instance of the confirmation of the execution of plaintiff's orders, plaintiff was notified that his orders were executed through another broker, because he was advised specifically on each such confirmation that the time of execution and the name of the broker would be furnished to him upon request. It also appeared in the Des Jardins case that the defendant firm did not have an account with Quinlan & Company, through which firm the defendant firm had claimed to have executed the orders of plaintiff therein, but that there was an account in the individual name of Stoppani, who was a member of the defendant firm. In the Des Jardins case the court's opinion shows that the defendants therein led plaintiff to believe, and by their reports to him expressly represented, that they had directly executed the orders for his account, whereas, in the case at bar not only is there no such evidence, but the only evidence adduced is to the contrary. The cases cited by the New York court to support its opinion in the Des Jardins case are cases showing clear evidence of direct misrepresentation on the part of the brokers involved therein. In the case at bar we have no evidence of any such misrepresentations as were involved in the Des Jardins case and in the cases cited therein. On the contrary, the evidence in the case at bar shows that defendants were scrupulously careful to keep plaintiff fully and correctly informed of the various steps taken in each transaction, and that they proceeded strictly in accordance with the terms of the customer's contract which plaintiff had signed. We shall discuss this phase of the case later on.

Plaintiff contends that the trial court failed and refused to apply the law of New York in accordance with plaintiff's interpretation of the New York court's opinion in the Des Jardins case, and thereby contravened Section 1, Article 4, of the Constitution of the United States. Neither plaintiff nor any of the defendants in the case at bar was involved in the Des Jardins case. That case involved parties and transactions in no way connected with the parties and the transactions in the case at bar. In this very case our Supreme Court, in determining that it did not have jurisdiction of the cause, held that Section 1, Article 4 of the Constitution of the United States, generally spoken of as the full faith and credit clause, was not involved; that the full faith and credit clause of the Constitution of the United States imposes an obligation and is distinguished from the rule of comity, which is a matter of courtesy and respect, but is not a matter of right. Referring to this contention of plaintiff, the court said:

"Speaking of the full faith and credit clause of the United States Constitution, Wiggins Ferry Co. v. Chicago & A. R. Co. (C. C. E. D.

Mo. 1882), 11 F. 381, 383, affirmed 108 U. S. 18, 1 S. Ct. 614, 27 L. Ed. 636, states: 'It relates only to the conclusiveness of such judgments as between the parties to them and there privies. It does not require that judgments in one State shall be followed by the courts of other States as matter of authority in other similar cases. The constitution does not deal with the question of the effect of such judgments as precedents, nor with the opinions of the courts rendering them. . . . The duty of the courts of one State to follow those of another, upon questions arising upon the construction of the statutes of the latter, is a duty resting alone upon comity, and not one imposed by the federal constitution.' [Esmar v. Haeussler (Mo.), 106 S. W. (2d) 412, 414.]''

It is true our Supreme Court did not pass on the merits of this case. Nevertheless, what it said on this point is applicable on the merits. We think the Des Jardins v. Hotchkin case is neither binding nor persuasive as authority in determining the case at bar.

It is conceded that the purchase and sale of securities involved in the case at bar were on margin. That is to say, plaintiff did not pay to defendants the full purchase price of such securities as he ordered. It, therefore, became necessary for Paul Brown and Company, plaintiff's broker, to provide the funds necessary to purchase the securities and to carry them until plaintiff should order them sold or delivered. It has been held that, in providing funds for such purpose, the broker does not act as the agent of the customer; that the relationship of debtor and creditor arises between the customer and his broker, and the *status* between them becomes that of pledgor and pledgee. [Matter of Mercantile Trust Co., 210 N. Y. 83; Small v. Housman, 208 N. Y. 115; Keller v. Halsey, 202 N. Y. 588.] In the Matter of Mercantile Trust Co., *supra*, it was held that, in the absence of evidence to the contrary, it is assumed that the customer has not had possession the stocks, and that he cannot secure possession thereof from the broker until he has paid the indebtedness due thereon.

In the case at bar plaintiff entered into a customer's contract with the firm of Paul Brown & Company, his broker, wherein plaintiff specifically consented in writing that all securities bought by his broker for his account and risk, which were not fully paid for by him, could be loaned by his broker or pledged, either separately or together with other securities, either for the sum due thereon to his broker or for any greater sum and without further notice to him. In addition thereto he was constantly reminded, throughout their transactions, of the customer's contract which he had signed, by the confirmations which were sent to him by defendants in each instance on a form which clearly and unequivocally set forth the terms and conditions upon which he and his broker were operating. Plaintiff's own exhibits 4 and 7 show these facts. Each confirmation sent by defendants' broker-

age firm to plaintiff, whether for a purchase or a sale, contained the following:

"It is agreed between the customer and Paul Brown & Company (1) that all orders are received and executed subject to the rules and customs of the market or exchange (and its clearing house, if any) where executed, (2) that all securities purchased or received for the customer's account and not paid for in full, or received as collateral, may be loaned by the brokers, or may be used by them in making deliveries or substitutions in their business, or may be pledged by them either separately or together with other securities, either for the sum due thereon or for a greater sum, and without retaining in their possession or control for delivery a like amount of similar securities, all without further notice to the customer and with his consent, which is hereby specially given. (3) That the brokers may whenever in their judgment it appears necessary for their protection and without any further notice to the customer, close out the customer's account or accounts, in whole or in part, by selling the securities therein held at public or private sale without any tender to the customer of the securities sold, or by buying at public or private sale any or all securities sold but not received from the customer for delivery."

Following the above there appears on each such confirmation, in larger type, the following:

"The time of execution and name of broker furnished upon request."

Mr. Adams, the only witness who testified in the case, stated that Paul Brown & Company always kept on deposit with their New York correspondent, to whom the securities of that firm's customers were hypothecated, an amount of free capital ranging from a minimum of $250,000 to a maximum of more than $2,000,000; that said firm was in a position at all times to withdraw any customer's securities for resale on the customer's orders, or for delivery on demand, and payment in full. Furthermore, plaintiff's account with Paul Brown & Company, his broker, shows that the broker actually sold and delivered all of plaintiff's securities as and when plaintiff ordered. Mr. Adams further testified that Paul Brown & Company never at any time hypothecated the securities of customers for a total amount in excess of the total amount due on such securities to Paul Brown & Company from the customers whose securities were hypothecated.

Special agreements between broker and customer, authorizing the broker to re-hypothecate the securities of customers for an amount in excess of any one customer's debit balance, such as the customer's contract shown in evidence in the case at bar, have been held to be valid and enforcible in accordance with their terms. In Meyers on Stock Brokers and Stock Exchanges, section 108, pp. 437, 438, it is said with respect to such rights of a broker:

"Special agreements between broker and customers granting these rights are valid and will be enforced in accordance with their terms. It has been so held with respect to agreements binding the customer to the usages and customs of the market where the transaction is effected (citing Baker v. Drake, 66 N. Y. 518, and other cases), agreements permitting the broker to re-hypothecate the customer's securities without limit as to amount (citing In re Toole, 274 Fed. 337; Papadopulos v. Bright, 264 Mass. 42; Furber v. Dane, 203 Mass. 108), and agreements dispensing with the necessity of demand for margin and notice of sale before closing out the customer's account (citing Smith v. Craig, 211 N. Y. 456, 461, and other New York cases).

.  .  .  .  .  .  .

"Such agreements are not contrary to public policy. [Citing Baker v. Drake, 66 N. Y. 518]."

The author of the above work points out that agreements containing such provisions are of the utmost importance if the broker's rights are to be safeguarded adequately; that the nature of the stockbroker's business requires him to re-hypothecate his customers' securities, together with those of other customers, as collateral for his own borrowings; that such a special agreement is therefore essential to give the broker the rights which the legitimate needs of his business demand but which, in the absence of the customer's consent, have been denied him by law.

It was agreed at the trial that, if plaintiff were present, he would testify that he did not know that Paul Brown & Company bought and sold in their own name, through New York brokers, until thirty days before the filing of the present suit. It is contended that plaintiff therefore is not bound by the action of his brokerage firm because he did not know said firm was executing his orders through another broker. Plaintiff argues that no title to the stock purchased for his account ever vested in him.

In Skiff v. Stoddard, 26 Atl. 874, the Supreme Court of Errors of Connecticut held that the title to stock purchased on margin by a broker for a customer had vested in the customer, even though there had been no actual physical delivery of certificates to the customer. The court said (l. c. 880):

"The law seeks substance not forms. It never requires the performance of a needless act. The juggle of a pass from Bunnell & Scranton through their customer back to them again would have satisfied in technical detail all the requirements of the completion of a purchase and the inception of a pledge. The result was obtained by omitting this useless performance which the law regards the parties to have waived. It is a well-recognized principle of law that formal manual delivery is not a necessary prerequisite of a pledge. 'If the pledgee has the thing already in his possession, the very contract transfers to him by operation of law the virtual possession thereof as a

pledge the moment the contract is completed.' [Markhan v. Jaudon, 41 N. Y. 235; Brown v. Warren, 43 New Hamp. 430; Providence Thread Co. v. Aldrich, 12 R. I. 77; Story on Bailments, section 297.]''

Plaintiff contends that defendants had no right in making purchases or sales on plaintiff's order to purchase and sell through New York brokers in the name and for the account of Paul Brown and Company. In 9 C. J., page 511, the distinction between a stockbroker and an ordinary broker is stated thus:

''An ordinary broker is generally a mere negotiator, acting avowedly for another as principal and having neither the title to, nor possession of, the property bought or sold. The functions of a stockbroker, however, are in a great majority of his transactions much broader. He makes the purchase in his own name, frequently paying all or a part of the purchase price, and is intrusted with the possession of the securities dealt in, receiving or delivering them without the name of his principal appearing in the transaction.''

With respect to the title to stock bought by a broker for a client on margin, it is said in 9 C. J., p. 542:

''Ordinarily, however, the title to stock bought by a broker for a client on margin or otherwise, whether purchased in his own name or not, vests in the client, subject, however, to a lien for the payment of advances and commissions due the broker, he being regarded as a pledgee of the stock.''

In Meyer on Stock Brokers and Stock Exchanges, section 49, page 275, it is said:

''It is customary for brokers in their dealings with other brokers not to divulge the names of their principals, but to make all purchases and sales in their own names. This is in fact the only method of trading ordinarily permitted on stock exchanges under exchange rules. Moreover, it is sanctioned by law. [Citing Horton v. Morgan, 19 N. Y. 170; Rogers v. Thomson, 215 App. Div. 541; Zimmerman v. Weber, 135 App. Div. 428; Harding v. Field, 1 App. Div. 391; Banta v. City of Chicago, 172 Ill. 204.]''

Plaintiff argues that the consent given by him in the customer's contract which he signed presupposed that there would be a legal purchase of securities and a vesting of the title in him; and asserts that, until such vesting of title occurred, no authority to pledge the securities became effective. He refers to section 162 of the Uniform Stock Transfer Act of the State of New York to support this contention, and asserts that there was no delivery to him of the securities involved as required by said Act. It is sufficient to say on this point that plaintiff did not plead said Stock Transfer Act, and offered no evidence whatsoever concerning it. Section 806, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., sec. 806, p. 1057) relied on by plaintiff herein does not have the effect which plaintiff seeks to give it. That

section makes available decisions of another State in a suit in this State where the law of such other State is pleaded but it does not bring into our courts the law of such other State not pleaded, nor does it make applicable the law of the other State by the mere pleading of it. [Menard v. Goltra, 328 Mo. 368, 40 S. W. (2d) 1053.] Furthermore, in making this point plaintiff disregards the simple, plain and unequivocal language of the customer's contract which he signed.

Plaintiff refers to exhibit 10, which is a photostatic copy of section 1, chapter 11, of the rules of the New York Stock Exchange, and argues that the manner in which the typical transaction of the United Gas Company stock was handled was in violation of said rule. Said rule provides:

"Sec. 1. No member while acting as a broker, whether as a specialist or otherwise, shall buy or sell directly or indirectly for his own account or that of a partner, or for any account in which either he or his partner has a direct or indirect interest, securities the order for the sale or purchase of which has been accepted by him or his firm or a partner for execution, except as follows."

The exceptions referred to are not applicable in this case. It is apparent that the above rule simply prohibits an agent from dealing with himself as principal. The evidence does not show any violation of said rule by defendants. In making this contention, plaintiff again ignores completely the relationship of defendants to him and their legal *status* as to such securities by virtue of the customer's contract which he signed, whereby he authorized defendants to re-hypothecate his securities, along with other securities, in a bulk loan. We must rule this point against plaintiff.

A consideration of the whole case shows that plaintiff, after having had the benefit of the services of defendants as his brokers in enabling him to do what he wanted to do, namely, invest in stocks on margin during a period of the most acute financial distress in the history of the entire nation, now complains, long after they closed their account with him, that defendants did exactly what he specifically authorized them to do and which they had a lawful right to do when so authorized by him. Plaintiff has presented no facts in this record which would warrant a court of equity in relieving him of any loss which he may have sustained, and placing such loss on those who merely served him at his request in carrying out his own purposes.

We have examined the entire record and have considered all the points presented by plaintiff, and find nothing which would justify any other conclusion than that reached by the trial judge. The judgment should be and is affirmed. *Hostetter, P. J.,* concurs; *Becker, J.,* not sitting.