**MARK TWAIN PLAZA BANK,**
**Plaintiff/Respondent,**

v.

**LOWELL H. LISTROM & COMPANY,**
**INC., Defendant/Appellant.**

**WD 37286.**

Missouri Court of Appeals,
Western District.

July 15, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1986.

Wesley B. Jennings, Kansas City, for defendant/appellant.

Jerome D. Riffle, Kansas City, for plaintiff/respondent.

Before NUGENT, P.J., and BERREY and GAITAN, JJ.

BERREY, Judge.

Defendant Lowell H. Listrom & Company, Inc., (hereinafter Listrom) a stock brokerage firm, appeals from a judgment of the circuit court. In this court-tried case defendant was found liable to Mark Twain Plaza Bank under the theories of promissory estoppel, negligent misrepresentation and fraudulent misrepresentation arising from the statements made by the president and an account executive of Listrom concerning the financial status of the margin account of Felix and Josephine Maranzino. The court awarded the bank damages in the amount of $34,800.00. Defendant Listrom asserts five points of error of which three directly attack some aspect of each of three doctrines under which liability was found. The other two apply to defendant's liability in general terms: (1) the Listrom account executive was not acting within the scope and course of employment as a servant of Listrom and Listrom's liability is dependant upon such finding; and (2) any statement made by the account executive was in furtherance of a conspiracy with Felix Maranzino negating Listrom's liability.

I. Background Facts

In June of 1979, Felix Maranzino applied to the Mid Continent National Bank of Kansas City, presently known as the Mark Twain Plaza Bank (hereinafter referred to as bank), for a business loan in the name of Felix Sales, Inc., a wholesaler of automobiles. As guarantors of that loan, Felix and his mother Josephine pledged 4,000 shares of Del Webb Corporation common stock as collateral. One thousand of the 4,000 shares of this stock were held in a margin account at B.C. Christopher and Company, another stock brokerage firm, and the remaining 3,000 shares were held in a margin account by Listrom. The maximum amount of money which could be borrowed from the bank with this collateral was 75% of the market value of the 4,000 shares of Del Webb stock or $47,500.

Prior to the signing of the credit line agreement with Felix Sales and the Maranzinos on July 3, 1979, Robert Martin, a vice-president of the bank, attempted by telephone to confirm that the shares of stock were free and clear of any encumbrances. Mr. Martin talked with Mel Levitt at B.C. Christopher and Company and he indicated the stock was available to be used as collateral with no encumbrances and could be transferred to the bank. Written confirmation of this fact was requested and B.C. Christopher and Company complied with that request.

Mr. Martin also called the Listrom brokerage firm and talked with Mr. Fred Azar, who was employed as a registered representative with Listrom and handled the Maranzinos' account, to confirm Mr. Maranzino's statement that the stock was unencumbered. Mr. Maranzino had referred Mr. Martin to Mr. Azar for that purpose. Mr. Martin testified to the particulars of this phone conversation; no evidence was submitted to refute it. He stated that he explained to Mr. Azar the purpose of his call: to verify that the Del Webb stock was unencumbered and transferable as the bank intended to use the stock as collateral for a loan to the Maranzinos' business. Without objection, Mr. Martin further stated Mr. Azar told him that the Dell Webb's stock was free and clear and would be delivered to the bank after the stock certificates were registered in the name of the Maranzinos. Mr. Martin then requested a "trust letter" from Listrom to evidence the foregoing facts and Mr. Azar responded that such a letter would be delivered to the

bank. Mr. Martin testified that a trust letter is "a letter on the letterhead of the brokerage firm whereby they will admit or state to the bank that they are going to take a certain action," and that it is often treated as the equivalent of collateral; it is kept in the bank vault as valued collateral.

Mr. Maranzino also contacted Mr. Azar on July 2 and asked him to write a letter to the bank assuring them of the delivery of unencumbered stock but Mr. Azar refused. Mr. Maranzino then contacted Lowell Listrom, president of the firm, requesting the same and, according to Mr. Listrom's testimony, told him he needed the stock to be delivered to the bank so he could borrow more money than allowed by the brokerage firm under Regulation T.[1]

Mr. Listrom discussed this request for a trust letter with Mr. Azar. The evidence at trial concerning this conversation is spotty. Mr. Listrom, in his deposition which was read into the record, stated Mr. Azar explained that Mr. Maranzino wanted to pay for the stock and have it delivered to the bank so that he would be able to borrow money using the stock as collateral. Mr. Azar's testimony (also read into the record from his deposition) did not reveal he gave such assurance. He stated he advised Mr. Listrom not to send the trust letter because there was a debit balance in the Maranzinos' account.

After this exchange Mr. Listrom sent the following letter to Mr. Martin on the Listrom stationery:

July 2, 1979

Mr. Bob Martin
Mid Continent National Bank
4901 Main
Kansas City, Missouri 64112
Dear Mr. Martin:
Please be advised that we will deliver as quickly as possible, 3,000 shares of Del Webb Corporation to the Mid Continent National Bank, for the account of Felix W. Maranzino & Josephine C. Maranzino.

Thank you very much.
Sincerely,
Lowell H. Listrom
LHL/rlr

The bank received a similar trust letter from B.C. Christopher and Company stating it would deliver the 1,000 shares of Del Webb stock "free," to the bank as soon as the transfer of the registered names took place. The bank did not disburse the loan proceeds to the Maranzinos until after these letters were in its possession.

The bank called Robert Stevenson, a registered representative with Dain Bosworth, Inc., as an expert witness to testify on the importance attached to these trust letters. He testified that in the normal course of business when there is a debit in the margin account a stock brokerage firm "would advise the bank that there is a debit in the account and [the certificates] cannot be sent until the debit is paid off." He believed the Listrom letter indicates there was no problem with delivery.

On July 30, 1979, Listrom received the stock certificates from the Morgan Guaranty Trust Company in New York representing the 3,000 shares registered in the names of Felix and Josephine Maranzino. The certificates were never forwarded to the bank; Listrom delivered them to the First National Bank of Kansas City as collateral for general firm borrowings. Subsequently, Listrom sold the Del Webb stock to Mabon Nugent Company for $41,487.15.

During this period of time there was no communication between Listrom and the bank, and Listrom did not inform the bank of the sale of the stock until January 1980 when Mr. Martin began investigating and inquiring into the absence of stock certificates in the bank's vault. The bank sent Listrom a letter demanding the delivery of the stock but Listrom did not comply.

On July 3, 1980, Felix Sales and the Maranzinos defaulted on the loan.[2] At the time of default, the fair market value of

---

1. Under Regulation T a stockholder may only borrow 50% of the market value of the stock.

2. Felix Maranzino eventually filed for bankruptcy and all state proceedings against him were stayed.

the 3,000 shares of Del Webb stock was $34,800.00. The bank sold the other 1,000 shares received from B.C. Christopher for $11,013.44 to reduce the balance on the loan amount to $37,566.12, an amount which did not include interest or attorney fees.

The question for an appellate court in a court-tried case is whether the findings are supported by substantial evidence, and unless the judgment is against the weight of the evidence, or unless the court erroneously declares or applies the law, the judgment will be affirmed. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We are concerned only with the correctness of the result, not the route by which it was reached. *Nedblake v. Nedblake*, 682 S.W.2d 852, 855 (Mo.App.1984).

The first point asserted by Listrom suggests that regardless of what theory is applied no liability may attach because the statements made by Azar concerning the Maranzinos' margin account were not made within the scope and course of his employment. The bank argues this alleged error is a "red herring" because the letter written by Mr. Listrom, standing alone, provides a sufficient basis for liability under each of legal theories relied upon by the circuit court. The answer to this question appears to be dependent upon which of the particular doctrines is applied. This court will also explore defendant's other allegations of error concerning each of these theories as asserted in defendant's points III, IV and V.

II. Promissory Estoppel

■ Under the doctrine of promissory estoppel Missouri courts have relied upon Section 90 of the Restatement of Law on Contracts for guidance. *Mayer v. King Cola Mid-America, Inc.*, 660 S.W.2d 746, 749 (Mo.App.1983); *Katz v. Danny Dare, Inc.*, 610 S.W.2d 121, 124 (Mo.App.1980). It states:

A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

From this, it has been stated by this court that three elements must be proved: (1) a promise; (2) detrimental reliance on the promise, and; (3) injustice can be avoided only by enforcement of the promise. *Katz v. Danny Dare, Inc.*, supra, 610 S.W.2d at 124. This estoppel principle is not predicated on misstatement of fact but rather rests upon *a promise* on which a party relies. Corbin, *Contracts* § 140 pp. 607–608. Thus, under these facts the Listrom letter may be isolated to determine if liability attaches.

■ Under Point III, Listrom charges the elements required for promissory estoppel are not fully satisfied because it could not have foreseen that the bank would advance funds to the Maranzinos on the basis of the language contained in the letter. For support, defendant cites *Otten v. Otten*, 632 S.W.2d 45, 49 (Mo.App.1982) which posits, under promissory estoppel, the facts must reveal the promissor should have or in fact clearly did foresee the precise action which the promisee took in reliance.

Here, the present facts support the conclusion that Listrom should have foreseen the bank's reliance. According to the chief margin clerk at Listrom, encumbered stock cannot be delivered to a bank. As a seasoned broker, Mr. Listrom was aware of the purpose of such a trust letter and of the bank's interest in it. He knew at the time he sent the letter that the bank intended to loan money to the Maranzinos and the stock was to be used as collateral. There also was evidence that Mr. Listrom sent this letter although advised by Mr. Azar against such action because the stock was encumbered. Therefore, this court agrees with the circuit court that defendant Listrom unconditionally promised to deliver the Del Webb stock to the bank and that defendant Listrom knew or should have known that the bank would rely on that promise.

### III. Misrepresentation

#### A. Agency

The circuit court found liability on the basis of negligent misrepresentation as well as fraud. Before examining the particular elements of these doctrines which the defendant brings into question, it would be advantageous at this point to determine whether Listrom is bound by the representations of Mr. Azar. Section 257 from the Restatement of the Law of Agency sets forth a pertinent proposition of law:

Misrepresentation; in General.

"A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:

(a) authorized

(b) apparently authorized; or

(c) within the power of the agent to make for the principal."

This precept applies not only where the agent has acted with the intent to mislead but where he failed to exercise reasonable care or competence in making the representation. Restatement (Second) of Torts § 257 comment b.

■ The evidence reveals Listrom had, by its conduct, entered into an implied agency relationship. *Stram v. Miller*, 663 S.W.2d 269, 270 (Mo.App.1983). The key to implied agency is the principal's acceptance of the agent's past conduct. *Id.*, Lowell Listrom admitted Mr. Azar was authorized to provide information concerning customer accounts to third persons such as the bank. Mr. Azar's testimony also substantiates that fact.

Listrom further argues, however, Mr. Azar was only authorized to release the correct information. "[A] power to make representations involves the possibility of making false and fraudulent ones." Mechem, A Treatise of the Law of Agency, § 1987, p. 1554–5; *see* also Restatement (Second) of Torts § 257, comment a. The Supreme Court in *Tietjens v. General Mo-*

tors Corporation, 418 S.W.2d 75, 84 (Mo. 1967) put it this way:

" 'Tested by reference to the intention of the principal, neither negligence or fraud is within the "scope of the agency;" .... The proper inquiry is whether the act was done in the course of the agency and by the virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent.' "

In view of the above stated proposition, Listrom is bound by the acts of its agent, Azar.

■ Listrom also attacks the Listrom-Azar agency by advocating Azar was acting as the Maranzinos' agent. First, as a general rule, when stocks are bought on the margin, as they were in this case, the "broker" [3] does not act the agent of the customer; a debtor-creditor relationship arises. *Esmar v. Haeussler*, 115 S.W.2d 54, 59 (Mo.App.1938). Second, beyond the Maranzinos relationship with the firm, Mr. Azar's affiliation with the Maranzinos, absent fraud and collusion, is of no significance because Mr. Azar, through the design of Listrom, was held out to the public as a representative of the company. Listrom is estopped from denying the existence of the agency because as a principal he placed Azar in a situation where persons of ordinary prudence are justified in presuming the agent had authority to act. *Stram v. Miller, supra,* 663 S.W.2d at 273. In other words, Listrom's argument is refuted by the agency concept of apparent authority.

■ It is recognized that an agent's collusion with a third party will prevent liability from inuring to the principal, *see generally Walnut Park Loan and Investment Association v. Hennkens*, 121 S.W.2d 179, 181[5] (Mo.App.1938); however, evidence that Mr. Azar and Mr. Maranzino had been social acquaintances for more than ten years and had maintained a business relationship for five years or more lends no support for such a proposition. Under

---

**3.** Under this proposition the "broker" would be

Lowell H. Listrom and Company, Inc.

point II defendant goes beyond alleging collusion to avoid liability and asserts the agency relationship disintegrates as Mr. Azar was acting in a criminal conspiracy with Mr. Maranzino to obtain money under false pretenses, a crime under 570.030, RSMo 1978. This contention is raised for the first time here on appeal. This court may not, even in a court-tried case, review an issue which was not put before the lower court to decide. *Rietsch v. T.W.H. Co., Inc.,* 702 S.W.2d 108, 109 (Mo.App. 1985).

### B. Negligent Misrepresentation

The necessary elements to find liability under this tortious doctrine are: (1) that defendant supplied information in the course of his business or because of some other pecuniary interest; (2) that because of a failure by defendant to exercise reasonable care or competence, the information was false; (3) that the information was intentionally provided by defendant for the guidance of a limited group, including plaintiffs, in a particular business transactions; and (4) that in relying on the information, plaintiffs suffered a pecuniary loss. *AAA Excavating v. Francis Construction,* 678 S.W.2d 889, 893 (Mo.App.1984). These elements adopted from Section 552 in the Restatement of Torts Second have been applied by the Eastern division of this court, *Id.; see also, Springdale Gardens, Inc. v. Countryland Development, Inc.,* 638 S.W.2d 813 (Mo.App.1983); *Ligon Specialized Hauler, Inc. v. Inland Container Corp.,* 581 S.W.2d 906 (Mo.App.1976); and *Aluma Kraft Manufacturing v. Elmer Fox and Co.,* 493 S.W.2d 378 (Mo.App. 1973), and this court in *Chubb Group of Insurance Companies v. C.F. Murphy and Associates,* 656 S.W.2d 766, 783 (Mo. App.1983) within the narrow confines of § 552. Judge Nugent, the writer for this court in *Chubb Group of Insurance Companies v. C.F. Murphy and Associates,* recognized the "important social policy of encouraging the flow of commercial information upon which the operation of the economy rests" and stressed this cause of action should be "limited to cases where (1)

the defendant has knowledge of the specific injured party's reliance; or (2) the plaintiff is a member of a group that the defendant seeks to influence; or (3) the defendant has special reason to know that some member of a limited group will rely on the information." *Id.,* at 784. Likewise, liability under this doctrine is more restricted than for fraudulent misrepresentation in that there is no requirement for intent to deceive; it is grounded "upon negligence of the actor in failing to exercise reasonable care or competence in supplying correct information." Restatement (Second) of Torts § 552, comment a. It is on this basis Listrom alleges the bank failed to meet its burden.

■ Defendant argues Mr. Listrom did not fail to exercise the reasonable standard of care in stating in his letter to Mr. Martin that the stock would be delivered as quickly as possible and that he did not negligently misrepresent anything to the bank. As previously noted, Mr. Listrom knew the purpose for which trust letters were used and had immediate access to information concerning the Maranzinos' account. Thus, Mr. Listrom could have easily given the bank accurate information instead of promising the stock would be delivered to the bank. Mr. Listrom testified that when writing a trust letter he usually states that the stocks are " 'fully paid for & free'—because this what the bank wants to know." Mr. Listrom recklessly disregarded the warning given by Mr. Azar not to send the trust letter because of the debit balance in the account.

■ Furthermore, Mr. Azar's representation to Mr. Martin, imputable to the defendant, that the stock was free and clear and available for delivery were not made in the exercise of reasonable care or competence.

■ Defendant also challenges another element under this cause of action: the lack of pecuniary interest in this transaction. Under comment "d" of Restatement (Second) of Torts, § 557, it provides that "the fact that the information is given in

the course of defendant's business, profession, or employment is a sufficient indication that he has a pecuniary interest in it, even though he receives no consideration for it at the time." As noted earlier, the task of disclosing this genre of information to third persons were part and parcel of the stock business.

### C. Fraudulent Misrepresentation

The trial court also found the evidence warranted a judgment against Listrom on the basis of fraudulent misrepresentation. The nine elements of fraud under Missouri law are:

> 1) a representation, 2) its falsity, 3) its materiality, 4) the speaker's knowledge of its falsity, or his ignorance of its truth, 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, 6) the hearer's ignorance of the falsity of the representation, 7) the hearer's reliance on the representation being true, 8) his right to rely thereon, and 9) the hearer's consequent and proximately caused injury.

*Sofka v. Thal,* 662 S.W.2d 502, 506 (Mo. banc 1983). All of the elements are satisfied in the instant case.

Listrom in its last point of error states there was absolutely no evidence that the statement made in the letter from Listrom to the bank was false or that Listrom knew it was false. The point is meritless.

■ First, defendant fails to recognize[4] that, notwithstanding Mr. Lowell Listrom representations, it remains liable to the bank for the fraudulent misrepresentations made by its agent Mr. Azar. This alone would justify an affirmance of the trial court's judgment.

■ Secondly, to answer the allegation raised by Listrom, this court notes that although Mr. Lowell Listrom made no positive representation as to the status of the Maranzinos' account, he failed to disclose the stock was encumbered, a material fact upon which the bank relied. "Silence or non-disclosure of a material fact, when used as an inducement to another, can be an act of fraud." *Miller v. Higgins,* 452 S.W.2d 121, 124 (Mo.1970). Additionally, according to the testimony of Mr. Azar, Mr. Listrom knew when he wrote the letter that the stock was encumbered and that the stock could not be delivered.

Judgment affirmed.

NUGENT, P.J., concurs.

GAITAN, J., concurs in separate opinion.

### GAITAN, Judge, concurring.

I concur in the results of the majority opinion, but believe that the opinion goes too far. Here there are multiple theories available upon which a trial court could have based its judgment. Any one of those theories, if supported by substantial evidence, will support an affirmation of the judgment of the trial court acting as the finder of facts, *Dickson v. Dickson,* 591 S.W.2d 267 (Mo.App.1979). Consequently, this court need not be concerned with the route which the trial court took to reach its conclusion. Rather, we are to be concerned with whether its judgment is supported by substantial evidence, *Nedblake v. Nedblake,* 682 S.W.2d 852 (Mo.App.1984). In this court tried case, the evidence supported the judgment of the trial judge.

Using the above standard to review the decision of the trial court and accepting the majority's analysis of the facts, there was sufficient evidence to support the proposition that Azar was acting within the scope of his authority when he advised Martin of the availability of the stock. His assertion was that the Maranzino stock was free and clear. That fact was ratified by Listrom's letter. More importantly, the statements in that letter amounted to a promise, which was relied upon to the detriment of the respondent, Mark Twain Plaza Bank, and justice requires enforcement of the promise. The evidence supports the invoking of

---

4. In its attack upon the application of the doctrine of fraudulent misrepresentation to the facts, defendant makes no reference to the representations made by Mr. Azar to the bank.

the legal principle of promissory estoppel. There is substantial evidence to support this theory. Further, analysis of the points relied upon by the appellant would be necessary only if the evidence was lacking.