**MILES HOMES DIVISION OF INSILCO CORPORATION,
Plaintiff–Respondent,**

v.

**FIRST STATE BANK OF JOPLIN,
Defendant–Appellant.**

**No. 16075.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 4, 1990.

Kendall R. McPhail, Lowther, Johnson, Lowther, Cully & Housley, Springfield, for plaintiff-respondent.

Karl W. Blanchard, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for defendant-appellant.

MAUS, Judge.

The plaintiff in this case is the mortgagee in a second deed of trust. The defendant is the named mortgagee in an underlying first deed of trust. The plaintiff seeks to recover by reason of the defendant's breach of a commitment to notify the plaintiff of the foreclosure of the first deed of trust. In a jury-waived trial, the court entered judgment for the plaintiff in the amount of $22,375.00. The defendant appeals.

The designation of the parties involved is as follows. Gerald J. Ames and Magdalyn Ames, his wife—Buyers. Plaintiff Miles Homes Division of Insilco Corporation—Seller. Defendant First State Bank of Joplin—Bank. The following is an outline of the facts. Additional evidence will be noted where relevant to the opinion.

On February 17, 1982, the Seller entered into a retail installment sales contract to sell the Buyers materials and plans for the construction of a kit house. The price was $41,151.12, payable in monthly installments of $359.59 for twenty-two months, with a balloon payment of $33,240.00. The contract provided the Buyers would secure the purchase price by a first deed of trust lien upon the real estate upon which the house was to be built.

Paragraph 4 of the contract provided the Seller "may refuse to ship any materials until it has received all required security instruments." Paragraph 21 provided:

"If you do not have marketable title of record sufficient to enable you to provide Miles with a valid first lien then, if required by Miles, prior to shipment of materials, you must cause the fee owner to join in a mortgage or deed of trust or you must obtain for Miles consents and agreements satisfactory to Miles with fee owners, mortgagees, and/or any other persons who do or may have an interest in your real property prior to Miles' interest."

On February 18, 1982, the Buyers purchased three acres from Lee Edwards for $8,500.00. To partially finance that purchase, the Buyers borrowed $6,800.00 from the Bank and secured repayment of the same by a deed of trust on that three acres. On February 19, 1982, the Seller, upon the basis of information supplied by the Buyers, directed an initial credit inquiry to the Bank, attention of Wayne Martin. The letter contained a number of blanks to be completed concerning the Buyers and the purchase of the land upon which the home was to be built. The blanks were completed, the form signed by Wayne Martin and returned to the Seller.

Thereafter, the Seller advised Buyers their credit had been approved. The Seller sent to the Buyers, for their execution, a

deed of trust to secure the purchase price. Seller then sent to the Bank a letter dated March 23, 1982. That letter forms the basis for this action.

The letter advised the Bank that Seller had taken a second mortgage on the three acres and understood that the Bank held the first mortgage on the three acres. It continued by saying that the Seller planned to furnish materials to the Buyers to improve the three acres with a new house. It then asked if the Bank would notify the Seller if the Buyers became seriously delinquent in their monthly payments on the first mortgage and notify the Seller prior to the commencement of any foreclosure proceedings so that the Seller "may take the necessary steps to protect our position."

The second page of the letter consisted of a form to be completed by the Bank concerning the purchase price for the three acres. It contained the following commitment. "We will notify you of serious delinquencies and provide you the opportunity to make payment before a mortgage foreclosure is started." It was signed on behalf of the Bank by Wayne Martin.

The Buyers executed the deed of trust which granted the Seller a second mortgage on the three acres to secure the purchase price for the materials. After receiving that deed of trust and the commitment of the Bank, the Seller shipped the materials for the house to the Buyers.

The Buyers partially completed construction of the house, but apparently abandoned the project. By November 1983, the Buyers had become seriously delinquent in payment of the note held by the Bank.

Lee Edwards, who had developed the subdivision in which the three acre tract was located, believed the uncompleted house detracted from the appearance of the subdivision. On November 6, 1985, he bought the note secured by the first deed of trust on the three acres from the bank for $5,125.00, the unpaid balance. On January 3, 1986, Edwards purchased the three acres at the sale foreclosing the first mortgage for $6,000.00. In February 1986, Edwards sold the three acres for $27,500.00.

The Bank did not give the Seller notice the Buyers were delinquent in payment of the Bank's note nor of the foreclosure of the deed of trust securing that note. The Seller had no notice of such delinquency or foreclosure sale. If it had been given such notice, it would have protected its second deed of trust by buying the note held by the Bank.

The trial court found the Bank's commitment to notify the Seller was supported by consideration. It also found

"16) The Court finds that the bank did violate its contractual obligation to Miles by failing to notify Miles of the serious delinquencies and by assigning the note and deed of trust to Edwards, thus permitting him to foreclose and buy the property at a fraction of its real value, thereby cutting off Miles' security for its note."

By deducting the unpaid balance of the Bank's note of $5,125.00 from the February sale price of $27,500.00, the trial court determined Seller's damage to be $22,375.00 and entered judgment for that amount.

■ The Bank first contends the trial court erred because there was no consideration to support a contractual duty on behalf of the Bank to give the Seller any notice. The Bank points out that the Seller was not obligated to pay the Bank's note or render any other performance to the Bank. It asserts "[T]he agreement was unilateral and lacked consideration for want of mutuality."

The Seller counters with the proposition that consideration may be found in a detriment suffered by a promisee. It points out that the promisee Seller suffered a detriment by shipping the materials to the Buyers. The Seller cites cases holding that detriment may constitute consideration, such as *Moore v. Seabaugh*, 684 S.W.2d 492 (Mo.App.1984).

However, in relying upon such cases, the Seller overlooks the following fundamental concept of consideration:

"The classic doctrine is that 'the promise and the consideration must purport to be the motive each for the other, in whole or

at least in part; it is not enough that the promise induces the detriment or that the detriment induces the promise if the other half is wanting.'"

17 Am.Jur.2d, Contracts § 92, at p. 435. Or, to put it another way, to constitute consideration in the classic sense, a promisee must suffer a detriment at the request of the promisor. 1 Williston on Contracts (3d ed.) § 113. Here, the Bank did not bargain for the Seller to suffer a detriment by shipping the materials. Recovery by the Seller may not be sustained by a determination that such detriment was, in the classic sense, consideration for the Bank's commitment.

■ However, that does not mandate reversal. "[T]he judgment must be affirmed if it is sustainable on any theory set forth in the pleadings or supported by the evidence." *Oldham's Farm Sausage Co. v. Salco, Inc.*, 633 S.W.2d 177, 180 (Mo.App. 1982).

This state has long recognized the doctrine of promissory estoppel. The following is an early expression of that doctrine couched in the terms of consideration.

"The question, then, is, can these notes be enforced, as valid contracts, notwithstanding Sheidley received no benefit therefrom, and intended them as purely gratuitous donations? If so, there must have been a legal consideration moving from the district to him. To constitute such consideration, it is not essential that Sheidley should have derived some benefit from the promise. The consideration will be sufficient to support the promise if the district expended money and incurred enforceable liabilities in reliance thereon."

*School Dist. of City of Kansas City v. Stocking*, 138 Mo. 672, 684, 40 S.W. 656, 658 (banc. 1897).

The Supreme Court applied that doctrine in *In re Jamison's Estate*, 202 S.W.2d 879 (Mo.1947) in which it cited, with approval, Section 90 of the Restatement of Contracts.

"Section 90 of the Restatement of the Law of Contracts states that: 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' This doctrine has been described as that of 'promissory estoppel,'...."

*Feinberg v. Pfeiffer Company*, 322 S.W.2d 163, 167–168 (Mo.App.1959).

The Bank had to know the Seller's letter of March 23, 1982, was sent to the Bank for a purpose. The letter stated the Seller had taken a second mortgage on the three acres. It said "We plan to furnish building materials". It requested notice so that "we may take the necessary steps to protect our position". It was obvious the Seller wanted a commitment from the Bank to give the specified notice for that purpose. Since the letter advised the Bank that the Seller merely "planned" to provide the materials, the Bank should have reasonably known the Seller would carry out that plan only in reliance upon the Bank's commitment to give such notice. Injustice can be avoided only by enforcing the commitment of the Bank. Compare *Mark Twain Plaza Bank v. Lowell H. Listrom & Company, Inc.*, 714 S.W.2d 859 (Mo.App.1986). Also see *Katz v. Danny Dare, Inc.*, 610 S.W.2d 121 (Mo.App.1980).

The Bank argues the Seller suffered no detriment in shipping the materials because it was legally obligated to do so. That argument fails because it ignores paragraph 4 of the contract which provides the Seller could refuse to ship any materials until it received "all required security instruments."

■ The Bank's next point is that the evidence was insufficient to support the trial court's finding that Wayne Martin had authority to bind the Bank by executing the commitment. Before executing that commitment in March of 1982, Wayne Martin had worked for the Bank for eleven months. He was a real estate loan officer. In January 1986 he was made assistant vice president. He terminated his employment with the Bank in August 1986. As part of his duties as a loan officer, he routinely replied to credit inquiries concern-

ing the status of loans made by the Bank. He doubted if he was authorized to execute the commitment to Seller without the approval of Mr. Buerge, the president of the Bank. The president was the chief executive officer and the owner of the Bank. Martin had no specific recollection of consulting the president about the execution of the commitment. However, he testified "I was in the habit that if it was something that I didn't know about, I would take it to Mr. Buerge to look it over, make sure that I had the authority to sign it." Mr. Buerge died in January 1984. He did not testify.

Evidence of a business routine or custom may establish an act was performed.

> "Asked, then, by the court, if he spoke from his recollection of the fact, or because, seeing the entry in the book, he thought that was the way in which the business must of necessity have been done, the witness responded: 'I can only say that, from seeing the entry here in my handwriting, that leads me to think that I turned over the collateral with the note.' This answer was objected to as incompetent, and error is assigned upon it. Greenleaf says: 'In fine, it is presumed, until the contrary is proved, that every man obeys the mandate of the law, and performs all his official and social duties. The like presumption is also drawn from the usual course of men's private offices and business, where the primary evidence of the fact is wanting.' 1 Greenl.Ev. § 40."

*Mathias v. O'Neill*, 94 Mo. 520, 526, 6 S.W. 253, 255 (1887). The following is an example of the recognition accorded that doctrine in determining that a car of corn was in good condition when it left a railroad yard.

> "His testimony was to the effect that, while he had no recollection of this individual car, he would have known by reason of such custom that such car was not in good condition, if such had been the fact. We believe this testimony made a case for the jury on the question as to whether or not the car was in good condition at the time it was delivered to the original carrier by plaintiff."

*Equity Elevator Co. v. Union Pac. R. Co.*, 191 S.W. 1067–1068 (Mo.App.1917). Also see *First National Bank of Independence v. Mid–Century Ins. Co.*, 559 S.W.2d 50 (Mo.App.1977); *Tex. Co. v. First Bank & Trust Co.*, 106 S.W.2d 28 (Mo.App.1937).

It was the function of the trial court to resolve the issue of Martin's authority from the whole of his testimony considered with the other evidence. The other evidence included the fact that a copy of the commitment was kept in the Buyers' loan file. Until the instant litigation, no one disclaimed that commitment on behalf of the Bank. The evidence established a standing practice of Martin and that Martin was a conscientious employee with ready access to the president. The trial court could reasonably find that Martin did not deviate from his standard practice and executed the commitment only with the approval of the chief executive officer and owner of the Bank.

■ The Bank's next point is that nothing in the commitment barred the Bank from assigning the note and that when it did assign the note, the contract was terminated. In essence, the Bank argues the assignment excused it from the performance of its commitment. This argument fails.

> "One cannot by his own act place himself in a position to be unable to perform a contract, then plead that inability to perform as an excuse for nonperformance."

*Arnett v. USX Corp.*, 763 S.W.2d 169, 171 (Mo.App.1988). Also see Corbin on Contracts § 1329, 1 Vol.Ed. (1952). The Bank's assignment of the note did not excuse it from performing its commitment.

The Bank's final point is that the Seller is barred from recovery because it negligently did not foreclose upon its second deed of trust when the Buyers defaulted in the payment of the obligation secured by that deed of trust and buy in the three acres. Had it done so, the Bank argues that by reason of § 443.325 the Seller would have had notice of Edwards' foreclosure. Further, it argues the Seller could have redeemed the three acres under § 443.410. It is not necessary to set forth

and consider the Seller's reasons why this point has no factual or legal validity. It is sufficient to observe that no circumstance established the Seller was required to anticipate that the Bank would not perform its commitment to give notice of an impending foreclosure. Corbin on Contracts § 959, 1 Vol.Ed. (1952). Cf. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573 (Mo banc. 1978). The point is denied and the judgment is affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.

HOGAN, J., recused.