Thomas SANDERS and Helen Sanders, Plaintiffs/Respondents and Cross– Appellants,

v.

HARTVILLE MILLING COMPANY, Defendant/Appellant and Cross– Respondent,

and

Cargill–Nutrena, a division of Cargill, Inc., Respondent.

Nos. 22445, 22446.

Missouri Court of Appeals, Southern District, Division One.

Feb. 9, 2000.

Motion for Rehearing or Transfer to Supreme Court Denied March 1, 2000.

Application for Transfer Denied April 25, 2000.

**192**

Timothy E. Gammon, Hulston, Jones, Gammon & Marsh, Springfield, for appellants.

D. Patrick Sweeney, Deborah K. Dodge, Hall, Ansley, Rodgers & Condry, P.C., Springfield, for respondent Hartville.

J. Kent Lowry, Sherry L. Doctorian, Armstrong Teasdale LLP, Jefferson City, for respondent Cargill–Nutrena.

JOHN E. PARRISH, Judge.

This is an appeal by Hartville Milling Company (Hartville) and a cross-appeal by Thomas Sanders and Helen Sanders (collectively referred to as plaintiffs). For briefing purposes, plaintiffs are designated appellants and Hartville and Cargill–Nutrena (Cargill) are designated respondents. *See* Rule 84.04(k).

Judgment was entered in accordance with a jury verdict for plaintiffs against Hartville on claims for product liability for defective dairy cattle feed (Count I) and negligence (Count IV). Judgment was entered for Hartville, pursuant to its motion for summary judgment, on nine of the eleven claims in plaintiffs' eleven-count petition. Judgment was entered for Cargill pursuant to its motion for summary judgment on all eleven claims.[1]

Hartville appeals the parts of the judgment in favor of plaintiffs. Plaintiffs appeal the parts of the judgment in favor of Hartville and Cargill. Plaintiffs state, however, that their appeal is "provisional"; that it will be pursued only if "the judgment based on the jury verdict" is reversed. The judgment is reversed as to the award of prejudgment interest. It is affirmed in all other respects and remanded with directions.

*Facts*

Plaintiffs had operated a Holstein dairy operation in Wright County, Missouri, since 1976. In 1987 they had a management sale and disposed of their dairy herd. Mr. Sanders explained, "In '87 we sold the herd, they sold it, extremely well, we had good records, they sold from two to four hundred dollars higher than cows around

---

1. Hartville asserts 12 points alleging trial court error (with two sub-parts to Point I). Plaintiffs assert three allegations of trial court error (one of which includes four sub-parts and one of the sub-parts has two separate claims of error). Briefs of such magnitude bring to mind the suggestion of Chief Justice Burger in *Jones v. Barnes*, 463 U.S. 745, 752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), quoting from Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L.Q. 115, 119 (1951), that " '[t]he mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases.' " Chief Justice Burger further suggests, "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52, 103 S.Ct. 3308. Perhaps that suggestion would be equally apropos with respect to multi-count petitions in trial courts that attempt to state numerous alternative theories of recovery.

there had been selling. The top cow brought sixteen hundred and fifty dollars."

In 1990 plaintiffs replaced their dairy herd. They began having problems. They experienced problems with their breeding program and with milk production. The newly acquired cattle developed foot problems and had poor appearances.

Plaintiffs had been feeding forage, wet brewers grain and a dairy ration they obtained from Hartville. Mr. Sanders contacted Hartville. He sought explanations for his cattle's decreased milk production. In the past Hartville had helped with nutrition problems by changing the formulation of its dairy ration. Hartville sent personnel who worked for Cargill, Inc., to discuss the problems plaintiffs were having—Hartville purchased feed products from Cargill. Phil Short and Curtis Hill contacted plaintiffs. Phil Short was a territory manager for Cargill. Curtis Hill was a sales representative for Cargill. Mr. Short often tested plaintiffs' forage as a nutrition representative of Hartville and made recommendations for formulation of the dairy ration Hartville provided plaintiffs. After those visits, at Hartville's suggestion, plaintiffs stopped feeding brewers grain to their cattle.[2] However, the condition of plaintiffs' cattle continued to deteriorate.

In 1991 plaintiffs decided to have a dispersal sale in order to obtain funds with which to pay feed bills and acquire a new herd of registered Holstein cattle. The herd was sold in October 1991. There had been a dramatic decrease in the herd's milk production before the sale. There had also been reproduction problems and symptoms of disease.

Plaintiffs' herd veterinarian during this period was Dr. Michael Gardner. He was herd veterinarian from 1990 to 1992. Dr. Gardner vaccinated the cattle for a variety of diseases, tested for parasites and fesque fungus, and did blood tests to attempt to find out what was wrong with the cattle. Dr. Gardner was unable to determine what was wrong. His conclusion was that the problem was nutritional. Plaintiffs sold 350 head of cattle at the 1991 dispersal sale. Plaintiffs expected to get $1,100 per head for the cattle. However, the milking cattle sold for between $575 and $800 per head, between $200 and $300 per head less than plaintiffs had expected. Mr. Sanders stated that the reasons for the low sales prices were the low milk production reflected on cattle productivity records and their appearance. He described the cattle's appearance and explained why plaintiffs needed to proceed with the sale in spite of the deteriorating condition of the cattle:

> [T]hese cows took on a parasite appearance, they looked like they was lousy, they looked like they was wormy, they dried up in their milk, the hair turned up on them and they was—I never seen any, you know, I couldn't imagine what would be the matter with these cows and we had already contracted these registered cows and by the time we got these, had to sell these cows, they looked terrible and then, you know, when they went to sell them, they just didn't sell good.

The cows plaintiffs had contracted to buy were from three different farms. They purchased 85 registered Holstein cattle after the dispersal sale. Fifty of the cattle were purchased from the Rob–Thom farm. Mr. Sanders was asked about the reputation of the Rob–Thom farm. He answered, "They're the top producing herd in Missouri." He explained that the Rob–Thom farm had "one of the better reputations in the whole world for Holstein cattle"; that "they export cattle all over the world."

In addition to registered Holstein cattle, plaintiffs bought other grade Holsteins,

---

**2.** Mr. Sanders testified, "Phil Short was out there and then they sent Curtis Hill back out there and then ... they told me that what was wrong with my cows was the brewers grain. They said, 'You're feeding too much brewers grain.'" Mr. Sanders explained that brewers grain is "a wet feed, it only contains 30 percent dry matter."

i.e., cattle that were not registered.[3] Plaintiffs also bought beef cattle for their farm.

A few months after plaintiffs bought the cattle, the dairy cattle looked like "anorexic skeletons." They experienced reproduction problems, eye cancers and pinkeye. Mr. Sanders testified that he had never before seen anything like the problems he experienced; that before 1990 he never had those problems. Mr. Sanders explained what occurred after plaintiffs got the 85 registered cattle:

> [W]e got this bunch, this herd of registered cows and we got them put together and by the time we had owned them, well, we started, we bought them in the last of November and then in November, last week of October, first of November, and then these, those cows there come the 7th day of November, I believe is what that says and these cows were in good condition and I had several people come and look at them. I know as soon as we got them home the dairy specialist from the county come and looked at them and was real, you know, he was really proud, he was like we were, we were proud of these cows and he was proud for us because he wanted to work with these cows, watch them produce and by the first of March, these cows looked like they was anorexic skeletons.

Mr. Sanders was asked about plaintiffs' beef cattle:

Q. So you had some beef cattle—

A. Yes.

Q. —on the place. Did you feed the beef cattle Hartville Mill product?

A. Yes, we did.

Q. Did you have any problems with the beef cattle?

A. Yes, we did.

Q. What were the problems with the beef cattle?

A. They died. They died from just first one thing and then another. We couldn't put our finger on—we would just go to the pasture and find them dead. We would go to the pasture and find them sick and we just couldn't, you know, we tried that for about three years and by the end of the third year we went from 90 cows to 60–some cows, we lost about 30. I think we lost 30 head of beef cows in three years.

Hartville and Cargill's territory manager, Phil Short, continued telling plaintiffs that the problems they were having with their cattle were nutrition problems. Plaintiffs talked to Dr. Gardner about the problem. Mr. Sanders also sought advice from University of Missouri extension agent Ted Probert, the Wright County dairy specialist. Mr. Probert brought Dr. David Hardin [4] and Dr. Jennifer Garrett to plaintiffs' farm. Mr. Sanders explained, "Dr. Harden is a vet, I'm not sure what Dr. Garrett is, she was supposed to have been in nutrition."

Dr. Hardin and Dr. Garrett looked at plaintiffs' herd. They believed there was a nutrition problem. They told plaintiffs to have Mr. Probert make a different ration. Plaintiffs tried the ration Mr. Probert formulated. Mr. Sanders observed, "[W]e tried some of it and it didn't help the cows at all, they just continued, they went on down and went down worse and their body condition kept getting worse on them." The feed for the Probert ration was bought from Hartville just as the other rations had been.

---

3. Plaintiffs kept a few of the cattle they had owned before the dispersal sale. Mr. Sanders testified, "[W]e had a mix-up or two on some cows and there was a heifer or two that they turned down. We let them check them and they found a heifer or two that was refitted and found a couple that was turned down by a buyer that didn't have his money."

4. Dr. Hardin's name is spelled "Harden" at places in the trial transcript. It is spelled "Hardin" in his deposition. This opinion will use the spelling used in the deposition other than in quotations from the transcript. When a direct quote is used, the spelling that appears in the quotation will be used without explanation.

Dr. Gardner testified that he had been the treating veterinarian for plaintiffs' herd. He first became the treating veterinarian for the herd around 1979. He was the treating veterinarian in 1990 to 1992. During that time he worked with other veterinarians and nutritionists to try to determine the cause of the problems plaintiffs' herd was experiencing. At different times during that period, he looked at the possibility that the problem was a nutrition problem.

Dr. Gardner was asked what plaintiffs' herd was like from 1979 to 1990. He explained that it was one of the top herds in Wright County. Dr. Gardner explained that it was desirable for dairy cows to have one calf a year; that this kept milk production up. He said plaintiffs' herd had good production. It had a good conception rate. Cows were breeding back. They were healthy. They looked good. His opinion was that plaintiffs were good managers.

During the period 1990 to 1992 circumstances changed. Dr. Gardner testified that problems occurred that he was unable to correct. He explained:

I tried everything that I knew to try. My blood tests for disease that I didn't think were in the area, I blood tested for anaplasmosis, I blood tested for, I believe, gluten, we did metabolic profiles and this is such as a doctor does for insurance exam, they take your blood and they test and see if your electrolyte balance is off.

We did—this is in addition to what we normally did, we tested for copper in the blood, we tested for selenium, even though we were supplementing and thought possibly that we had problems there that were missing and in my mind that's the things that we did. There may have been others but we checked for everything that you could think of and we came up with no causative agent.

Dr. Gardner stated that he had ruled out a lot of possibilities. However, he had not checked the cows for aflatoxin. At the time he quit as plaintiffs' herd veterinarian in 1992, he had not formed an opinion as to what the cause of the problem was. He was very frustrated. He remained interested in plaintiffs' herd although he was no longer herd veterinarian. He later formed an opinion about the cause of the problem. Dr. Gardner's diagnosis was that the cause was aflatoxin coming from feed from Hartville's feed mill. Dr. Gardner was asked, "And my question then is to a degree of reasonable veterinary medical certainty, are you convinced that's what was wrong with [plaintiffs'] herd in '92?" Dr. Gardner answered, "Yes, I am."

Dr. Gardner explained how he reached his opinion:

I talked with other veterinarians, Dr. Behan, that had worked with another case, another herd that I'm working with now, the Kalhoefer herd and he made the diagnosis there, talked to him about it, Dr. Ehlers had seen that herd. I have talked with Katrina Watts that has aflatoxacosis in her herd. The signs were similar, the signs were—well, basically the same in these herds. Studying the literature, talking to people that are experts in this field that have worked with it more than I have, I have come to this conclusion and the reason I'm sure it's come from Hartville Mill is because we had it in calves, we had—some of the common signs are cancer, cancer eyes, rough coat, reproduction problems and we can look at these herds, these two other herds are also top herds and their production fell off, they've had to sell a tremendous percentage of their herd but the reason I'm sure it came from the feed is because it was in calves and these calves were not getting any silage, they were not getting any hay, they were getting—they would be fine until they moved to this bin and they were getting feed that came from the feed lot that was their diet. These fit. We've tested everything we know, I've checked with other veterinarians in the area and they concur, . . . .

Dr. Gardner stated there was no cure for aflatoxin. He could not pinpoint when the incidents of aflatoxin occurred in plaintiffs' herd. He did not know what load of feed it came in on. He stated, however, that there were general time periods when it appeared to have been worse. Dr. Gardner stated that from January 1990 until March 1991 he used a tremendous amount of antibiotic in the calves trying to clear them up from either respiratory or pinkeye. It would help but did not cure the situation. He explained, "[W]hen they're weakened and have a secondary infection from bacteria, antibiotics will help fight the secondary infection so the animal's only fighting one battle at a time just fighting the toxin and the antibiotic is fighting the infection." Dr. Gardner stated that one of the results of aflatoxin is that cattle will be more susceptible to infections or other diseases. They are also susceptible to abscesses.

Dr. Gardner explained that mycotoxins are toxins that are produced by molds; that aflatoxin is a specific one. He told the court and jury, "Aflatoxin is the most potent carcinogen known to man, it causes cancer, worse, I mean it's the most severe toxin that they know to cause cancer." He testified that each molecule of aflatoxin can change one cell and can cause cancer. He stated, "[I]t's so toxic that a cow can eat this, ingest this and die within 12 hours, usually they have liver damage, they have low sugar, they get an electrolyte imbalance, they go into shock and die." According to Dr. Gardner, other forms of aflatoxin affect a cow's digestion. He explained:

[I]t affects the cow's digestion in four ways. It ruins their appetite, hepatitis, people that have hepatitis do not want to eat.

It affects the absorption of the nutrients. When the nutrients aren't absorbed they cannot utilize them and it affects the digestion of the nutrients. The whole deal works on the basis of energy. When a cow runs out of energy it's just like us when we run out of energy, nothing works. The liver is, and I didn't make this story up, I just had to learn it, gluconeogenesis. What it means is the creation of new sugar. Without this sugar a cow can't function. In acute case, the cow is dead, we don't have to be concerned with that.

With the other cows, the ones that live, their reproduction is affected, the production is affected, their appetite, they get a rough hair coat, they just look like different cows altogether.

Dr. Gardner expressed the opinion that dairy cows are particularly susceptible to problems from feeding aflatoxin. He explained that the toxins grow fast in moist grain; that in 24 hours, mold can grow and produce toxins.

Dr. Kimberly Ehlers began treating plaintiffs' herd in 1993. She saw unusual problems in the herd in 1993, 1994, 1995 and 1996. She explained, "There was a high increase in incidence of eye tumors, what we call schema, a skin carcinoma or skin cancer of the third eyelid mostly and a lot of tumors behind the eye, a lofoma type cancer." She told the trial court that what was unusual was that there were so many incidents of these problems in plaintiffs' herd. She saw 11 cows with eye tumors, primarily during 1995 and 1996. Dr. Ehlers said that she would expect to see "maybe zero to one" in a herd in a year, whereas plaintiffs' herd had 11 in two years, five to six a year.

Dr. Ehlers told the court that she looked at plaintiffs' entire herd with some feed salesmen. She said she did not usually get an opportunity to do that. She told of her observations:

We went down and looked through the whole herd and the older cows were very thin, just wouldn't put on weight. The younger cows looked really good, good body condition we call it, the fat content to their body was good but the older cows didn't look at all like those younger cows did.

The older cows' hair coat was rougher. Dr. Ehlers observed the herd in the spring. The younger cattle were slicked off, but the older cows were not. She characterized the differences, "I would say body condition-wise on a scale of one to five, the older cows were two or less and the younger cows appeared to be about three or higher, there was a gap in there."

Dr. Ehlers stated her opinion to a reasonable degree of medical certainty was that the problem in the herd was aflatoxacosis. She agreed with Dr. Gardner's conclusion although her opinion was made independent of Dr. Gardner's. Dr. Ehler's opinion was that the aflatoxin occurred prior to the time she became the regular attending veterinarian for plaintiffs' herd in 1995.

Darin Saylor worked for Hartville in 1991 as a feed mixer. He testified that "fines" would be taken to Ava, repelleted and brought back to Hartville's mill.[5] He testified that Hartville was doing this before he became the feed mixer. He did not recall how long it would take for the fine bin to fill up; at different times of the year it would fill up faster than others. He stated that it did occur more frequently than once every three months. Mr. Saylor was asked the following questions and gave the following answers:

Q. Where they're collected as the fines are screened and they're sent to the different bins. Would the normal practice be to wait until this fine bin is full before a load is taken over to Ava, or would you do that when it was half full or a fourth full or was there any method to it at all?

A. Usually, I mean we checked the bin, a lot of times we were up top.

Q. Okay.

A. And from time to time we would pull the top off and look and see how full the bin was.

Q. Okay.

A. When it was getting full—

Q. Okay.

A. —we went ahead and let someone know and then emptied the bin.

Q. Okay. Were some of the fines in the bin used in making salt mixes or other things to your knowledge?

A. Yes.

Mr. Saylor sometimes noticed moldy or caked feed in the bins. It would sometimes go into feed for beef cattle or dairy cattle. It sometimes was ground with pulverized corn. Caked or moldy fines were more likely in the summer when fines sat in the bin longer.

Sometimes feed that had been delivered to farms was picked up and returned to Hartville's mill. Mr. Saylor was asked what would happen to the returned feed, whether it would be resold or bagged or destroyed. He answered:

Sometimes if it was a—at the time they had a 16 percent dairy, 19 percent dairy mix they would screen fines if, you know, it was always looked at, you know, someone always looked at it to see what exactly the problem was, and then they would screen, you know, if there was fines actually in the pellet and cracked corn, they would screen it. And if it was a 19 percent dairy mix exactly like we sold on the floor, they might put it back through and bag it for floor feed. They might use it for a bulk mix if a farmer was getting a 19 percent dairy mix.

Mr. Saylor said that when fines went to Ava, it would sometimes be a day before a truck would bring the repelleted product back. When they were returned, they would usually be put in a separate bin.

5. "Fines" were referred to throughout the trial without a precise definition of the term. Webster's New Collegiate Dictionary 430 (1977), defines "fines" as "finely crushed or powdered material" and "very small particles in a mixture of various sizes." One witness explained that pellets were like pretzels and pellet fines were like the crumbs off the pretzels; that pellet fines are crumbs off the feed.

The bin where the repelleted fines were placed would usually be marked; "usually took a piece of masking tape and then just took a marker and wrote." The repelleted fines were usually used in "12 percent dairy feed." Mr. Saylor explained that repelleted fines sometimes went into bagged feed and sometimes in bulk feed.

Dr. Dan Netemeyer is a nutritionist for Missouri Farm Association (MFA). He has undergraduate and Ph.D. degrees in dairy nutrition. His work includes dealing with aflatoxins. He advises MFA's 12 mills about problems with aflatoxins. Before working for MFA, Dr. Netemeyer was an extension agent. The area where he worked was Howell, Oregon, Shannon, Texas, Douglas, Ozark and Wright Counties. He was aware of plaintiffs. He had been to their farm. His opinion was that Mr. Sanders was a good dairyman. Dr. Netemeyer gave the opinion that it was good practice for feed companies to "shake the fines out" at the time they formulate pellets "and put them right back in the next time you make that feed before they get too stale." He said it was appropriate to follow that procedure the same day that the fines are accumulated in the milling process or within a reasonable time.

Dr. Netemeyer was asked about the practice of "screening fines into a bin that would set there for long periods of time, meaning more than ten days." He explained, "I'm not saying it doesn't happen but when it does happen you definitely should use a very small percentage of that in the feed. You wouldn't want to make an entire feed out of that, total residue of screen fines." He did not approve of the practice of using fines that would sit in a bin for 30 days or more and then be taken to another plant and repelleted. He stated the problem with that procedure was that "you've got a bunch of old stale feed the cows won't want to eat, possibly, pretty sure they're going to go down in milk and the next thing is you could have invisible mold spores, what we call mycotoxins."

Dr. Netemeyer had studied aflatoxins as they relate to nutrition. He stated that how aflatoxins and mycotoxins are produced and what they do to feed and how to test for them was very important in his work as a nutritionist. At times he advised farmers about the subject. He had written a quality control manual about aflatoxins or mycotoxins for MFA. He was knowledgeable about how aflatoxins grow and how they are tested and what they do to feed.

Dr. Netemeyer stated the opinion that repelleted fines are more likely to have mycotoxins. He was asked to explain why. He answered:

> The reason why is because when you break that corn and those other ingredients down into smaller particles and went to steam, the heat—you did the same thing like if you made bread, you made that starch much more available. If you had any mold spores and had moisture and you have heat and all it takes is one to start—most of you are aware, you've had mold start and not notice, once it starts, it goes very fast. I'm not saying it always causes mold but the conditions are right you can have—I mean it's one of them deals kind of like walking across the street blindfolded, that don't mean you're going to get hit but you don't want to do it all the time, it's a thing to avoid.

Dr. Netemeyer's opinion was that fines should not be repelleted and sold to farmers.

Dr. Netemeyer was asked if putting fines that had accumulated for 30 days or more in a salt mix would increase the possibility that there were mycotoxins in that salt mix. He answered that it would. He testified about the effect of repelleting fines, running caked or moldy feed through the mill, using fines after 30 days in a salt mix, and unloading in the rain. Dr. Netemeyer said these practices would substantially increase risk of mycotoxin, aflatoxin. He said the average dairyman

would not necessarily be able to identify the presence of aflatoxin in feed.

### Hartville's Appeal—No. 22445

Point I asserts that the trial court erred in failing to direct a verdict for Hartville and in failing to grant Hartville's motion for judgment notwithstanding the verdict or its motion for new trial because plaintiffs failed to offer evidence from which the jury could have found all elements necessary for plaintiffs to recover on Counts I and IV. Hartville argues that plaintiffs failed to present evidence that Hartville sold feed not fit for animal consumption, or that it failed to use due care in manufacturing and selling feed thereby causing that feed to be contaminated with aflatoxin.

Point I is directed to requirements of plaintiffs' verdict-directing instructions, Instruction No. 6 and Instruction No. 8. Instruction No. 6 relates to Count I, plaintiffs' claim for product liability for defective dairy feed. Instruction No. 8 relates to Count IV, plaintiffs' claim for negligence.

Instruction No. 6 states:

Your verdict must be for plaintiffs if you believe:

First, [Hartville] sold feed for animal consumption, and

Second, plaintiffs [sic] cattle ate the feed, and

Third, the feed when sold by [Hartville] was not fit for animal consumption, and

Fourth, as a direct result thereof plaintiffs were damaged.

Instruction No. 8 states:

Your verdict must be for plaintiffs if you believe:

First, [Hartville] sold plaintiffs feed, and

Second, [Hartville] failed to use ordinary care in the manufacture and sale of feed, and

Third, as a result of such failure, the feed was contaminated with aflatoxin, and

Fourth, as a direct result of such failure plaintiffs sustained damage.

Hartville suggests that this case is similar to *White v. Thomsen Concrete Pump Co.*, 747 S.W.2d 655 (Mo.App.1988). *White* was a wrongful death claim that arose from the electrocution of a person using a remote control box to operate a concrete pump. The claimants in *White* failed to prove that an alleged defect in the remote control box (the absence of an item inside it) occurred before it left the manufacturer, or that the missing item had been removed from the box while a distributor had it after the concrete pump had been delivered to the employer of claimants' decedent. *White* held that the claimants had not met the required burden of proof. It held that although existence of a defect may be inferred from circumstantial evidence, there must be a showing, without resorting to guesswork or speculation, that such inferences were reasonably probable. *Id.* at 661.

The evidence in *White* was that after the concrete pump (including the control box) was delivered to the employer of claimants' decedent, one of the switches in the control box malfunctioned. The distributor was called. Its service representative went to the machine and opened the control box in order to get the serial number of a defective switch that needed to be ordered and replaced. The service representative testified that he did not remove anything from the control box. There was testimony that at a time after the service representative opened the control box, an employee of the owner of the machine disassembled the control box to attempt to repair the defective switch. He removed a "gasket" from the box. At trial, the employee was shown a sample of the missing item that claimants contended caused the malfunction that produced the death of their decedent. The employee testified

that it looked "about the same" as the "gasket" he had removed. *Id.* at 657.

The court concluded that the record did not show, even by inference, that the manufacturer failed to put the missing item in the control box or that the missing item had been removed from the control box through fault of the manufacturer or the distributor. The court pointed out that the only evidence presented was that an employee of the purchaser of the machine had removed the item. The court concluded that the jury had been left to speculate whether an employee of the manufacturer failed to put the missing item in the control box; whether the distributor had removed the item after the machine had been sold by the manufacturer; or whether the employee had taken the item out of the box after the machine was sold by the distributor. It held that the claimant had not made a submissible case. *Id.* at 660–61.

■ The facts in this case differ from those in *White*. Unlike in *White*, plaintiffs' case did not depend on a showing that a particular thing was done or not done. It depended on a showing that plaintiffs' cattle were harmed by consuming feed manufactured and sold by Hartville; that the feed was contaminated due to Hartville's milling practices.

There was evidence that Hartville engaged in milling practices that increased the likelihood that aflatoxin would form in the feed it produced. There was also evidence from other persons who purchased and fed feed from Hartville about problems they experienced during the times in which plaintiffs experienced problems.

Mike Parker bought dairy feed from Hartville until 1991. The last year he bought feed from Hartville, his cattle experienced decreased milk production, sickness, poor appearance, cattle dying and reproductive problems.

John Burkdoll, a farmer for over thirty years, bought feed from Hartville for about a year around 1993. He testified that his cattle experienced the same problems as plaintiffs' cattle-decreased milk production, poor appearance, sore feet and reproductive problems.

■ Although circumstantial, there was sufficient evidence from which the jury could have found that Hartville failed to use due care in manufacturing and selling feed; that feed it delivered to plaintiffs contained aflatoxin. There was sufficient evidence for the jury to have found that the consumption by plaintiffs' cattle of feed delivered by Hartville harmed those cattle. *See Albers Milling Co. v. Carney,* 341 S.W.2d 117 (Mo.1960). The fact that only circumstantial evidence is presented on a material issue is no bar to recovery. *Vaughan v. Taft Broadcasting Co.,* 708 S.W.2d 656, 661 (Mo. banc 1986).

Point I further argues that plaintiffs' evidence did not provide a basis for finding that Hartville damaged plaintiffs' herd by delivering contaminated feed. Hartville contends that, according to plaintiffs' evidence, in order to determine the existence of aflatoxacosis, feed that plaintiffs' cattle were consuming would have had to be tested at the time the cattle exhibited an onset of problems. Hartville points to testimony that the way to determine whether a cow was affected by aflatoxin would be to perform a liver biopsy to see if there were symptoms of aflatoxin poisoning and, if there were, the extent of any harm to the cow.

Hartville argues that plaintiffs relied on a "leap of faith" diagnosis by Dr. Gardner to support their claim that plaintiffs' herd sustained damage from aflatoxin in feed Hartville delivered; whereas, plaintiffs presented other evidence that testing was necessary at the time of any problem in order to make a diagnosis of aflatoxin poisoning and to determine its source. On that basis, Hartville contends that plaintiffs failed to present sufficient evidence to support Count I and Count IV of their petition. Relying on *Baker v. Guzon,* 950 S.W.2d 635 (Mo.App.1997), Hartville ar-

gues that plaintiffs did not have sufficient evidence that the harm to plaintiffs' cows was attributable to its delivery of contaminated feed.

Since there were no tests of feed or biopsies of cows performed, Hartville contends plaintiffs' evidence of the cause of their losses was self-contradictory. Hartville points to the statement in *Baker*, "Where the only evidence of a necessary element of a claim is self-contradictory, it does not constitute sufficient evidence." *Id.* at 646. Hartville argues:

> Clearly plaintiffs [sic] evidence is self-contradictory in that on one hand, plaintiffs rely upon the "leap of faith" diagnosis made by Dr. Gardner years after [Hartville] delivered feed to plaintiffs; and on the other hand, plaintiffs elicited testimony in their case that testing was necessary at the time of any problem in order to make such a diagnosis and to determine the source of the aflatoxin poisoning.

Hartville's reliance on the statement from *Baker* is misplaced in the context of this case. The statement in *Baker* to which Hartville alludes is a quotation from another case, *Tompkins v. Cervantes*, 917 S.W.2d 186, 189 (Mo.App.1996). In considering the quotation, the facts to which it relates in the case in which the quotation appears must be understood. In *Tompkins* the language used by an expert witness to express an opinion was equivocal. In addressing that circumstance, the court pointed out that testimony of an expert as to causation, to be probative, "must be given to a reasonable degree of certainty." *Id. Tompkins* explains, "When an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Id.* It is in this context that *Tompkins* proclaims, "Where the only evidence of a necessary element of a claim is self-contradictory, it does not constitute sufficient evidence." *Id.* at 190.

In this case there was expert testimony by Dr. Gardner that the problems plaintiffs experienced with their cattle were symptoms of aflatoxin. Dr. Gardner testified that he believed, to a reasonable degree of medical certainty, that this was caused by the cattle eating feed formulated and sold by Hartville. He did not equivocate. Plaintiffs' evidence was not self-contradictory.

Hartville further argues that plaintiffs failed to prove causation because they failed to point to a specific delivery of feed that may have caused harm to their animals. Hartville complains that there was no evidence that a veterinarian came to plaintiffs' farm to examine the cows soon after the "bad" feed was supposedly delivered. Hartville cites *Green v. Ralston Purina Co.*, 376 S.W.2d 119 (Mo.1964), for the proposition that this was necessary in order for plaintiffs to prove causation.

*Green* was an action for breach of implied warranty relating to chicken feed. Mr. Green sold feed and raised broilers. He brought an action against Ralston Purina for damages he alleged he sustained as a result of feeding a product Ralston Purina sold to him. He had fed a new high fat broiler feed Ralston Purina sold. After the chickens he fed reached the age of three to seven weeks, they became sick and a large number died. There was no expert testimony presented at trial to tie the sickness and deaths experienced by Mr. Green's chickens to the chicken feed. There was testimony that someone from Missouri University made an investigation and reported he did not know and could not tell whether the problem was a feed problem or a chicken problem. There was testimony that the person who conducted the investigation reported that "it *could be* a combination of both; that it *might be* that the chickens were not strong enough to stand the feed or that the feed was not strong enough for the chickens; that it *might* have too much fat." *Id.* at 122 [emphasis in original].

*Green* reversed a plaintiff's verdict and remanded the case for new trial. In assessing the deficiencies that led to the judgment being reversed, the court noted that the issue of causation in the case was "essentially a matter of expert opinion; questions of medical science which a court or jury could not answer without the aid of expert opinion, ... but plaintiff produced no expert witnesses to establish that the feed was unwholesome or harmful or that it caused the production difficulties encountered." *Id.* at 124 (citations omitted).

Here, unlike in *Green*, plaintiffs presented evidence of practices in which Hartville engaged in formulating its feed that increased the likelihood of aflatoxin developing, and that cattle of other farmers who fed Hartville feed suffered the same symptoms as those experienced by plaintiffs' cattle. The expert testimony of Dr. Gardner was presented. He testified to a reasonable degree of medical certainty that plaintiffs' cattle problems were due to aflatoxin from feed produced and sold by Hartville. *Green* is not on point for the proposition for which Hartville cites it.

Causation may be proven by circumstantial evidence. *Kappel v. Slickman*, 401 S.W.2d 451, 453 (Mo.1966); *Delisi v. St. Luke's Episcopal–Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 175 (Mo.App.1985). Point I is denied.

■ Point II is directed to the amount of judgment. The trial court entered judgment for plaintiffs, in accordance with the verdict, in the amount of $402,000. Point II asserts that plaintiffs did not "establish the extent of the damage ... in that there was no testimony or evidence defining the damage or that it was caused by [Hartville]." On that basis Hartville claims the trial court erred "in failing to grant [Hartville's] motion for directed verdict and in failing to grant its motion for judgment notwithstanding the verdict, or in the alternative, grant [Hartville] a new trial due to the excessive verdict."

Hartville contends there was no substantial evidence supporting damage calculations admitted in evidence through the testimony of economist Larry Cox and University of Missouri extension farm management specialist Jim Thompson. Hartville argues that the jury was, therefore, allowed to speculate as to the extent of damages and duration of any harm sustained by plaintiffs' dairy cows.

> The amount of damages awarded is primarily a matter for the jury, and the jury's broad discretion in determining the amount of damages is conclusive on appeal, especially where the verdict has the approval of the trial court as evinced by its overruling the motion for j.n.o.v. or for new trial. *LaMartina v. Hannah*, 675 S.W.2d 444, 447 (Mo.App.1984). The assessment of damages by the jury will not be reversed on appeal if there is substantial evidence to support the verdict and if damages were returned on any rational assessment of evidence. *Moore v. Missouri Pac. Ry.*, 825 S.W.2d 839, 846 (Mo. banc 1992).

*Dayton Const., Inc. v. Meinhardt*, 882 S.W.2d 206, 209 (Mo.App.1994).

Plaintiffs, Dr. Gardner and Dr. Ehlers testified about the cattle's poor appearance, reproductive problems and their decreased milk production. They testified about cattle dying and experiencing a high increase in incidences of eye tumors (identified as "schema, a skin carcinoma or skin cancer of the third eyelid mostly" according to Dr. Ehlers) and other tumors behind the eye. Dr. Gardner testified that the symptoms exhibited by plaintiffs' cattle were symptoms of aflatoxin. His opinion within a reasonable degree of medical certainty was that the problems were caused by aflatoxin.

Jim Thompson is a farm management specialist with the University of Missouri Extension Service. He has a B.S. degree in animal science and a Masters degree in agricultural education from the University of Missouri. At plaintiffs' request he calculated the amount of losses they incurred

during the period they experienced the problems attributed to aflatoxin. His calculations were of losses incurred in 1990, 1991, 1992, 1993, 1994 and 1995. The total losses he identified for those years were $268,808.33. Mr. Thompson testified at length concerning the methods he used in making his calculations. He stated that the calculations he made were acceptable accounting and statistical practices that were supported by what other people in his industry did.

Larry Cox is an assistant professor of economics at Southwest Missouri State University. At the time of trial he had taught there 20 years. He holds a B.S. degree in Business Administration with a minor in economics "from the University in Hayes, Kansas" and a Master of Arts in economics from Kansas State University. He has 60 additional credit hours of graduate study in economics from the University of Missouri, Columbia. He also engages in the business of doing damage analysis for attorneys. Mr. Cox was asked what plaintiffs' attorney asked him to do. He answered:

> You asked me to look at [plaintiffs'] loss on their farm or dairy farm due to aflatoxin and the effect it had on their cattle on their milk production and that type of thing and to look at the economic effect for a period of time, about the middle of 1990 until about probably 1995.

Mr. Cox explained what he relied on in forming his opinion concerning the amount of loss plaintiffs sustained. He stated that he got material from plaintiffs' attorney and from plaintiffs, "some of their records particularly." He testified:

> I was told how many cattle they lost and when they lost them and why they lost them and how much extra they had to pay for artificial insemination that they feel is a result of the aflatoxin, how much the milk production was diminished by their estimate of their milk production being diminished by the aflatoxin and things such as that, as well as Mr. Jim Thompson, the County Agent out of

Lebanon, I looked at some stuff he did regarding also milk production and the cost, value of the milk each year due to the aflatoxin.

Mr. Cox testified that he compared Mr. Thompson's calculations with his; that he relied on Mr. Thompson's estimate of how much milk plaintiffs lost and the value of the milk without doing independent research in that area. Mr. Cox identified an exhibit, Plaintiffs' Exhibit No. 63, that contained his calculation of damages. The exhibit was admitted in evidence. It calculated $443,060 damages incurred by plaintiffs.

Hartville cites *Missouri Farmers Ass'n v. Kempker,* 726 S.W.2d 723 (Mo. banc 1987), in support of its claim that plaintiffs failed to provide evidence that defined its damages or established the damages claimed were caused by Hartville. Hartville correctly asserts that *Kempker* supports the proposition that damages to livestock in a products liability case that arise from ingestion of faulty feed must be supported by expert testimony.

*Kempker* was a suit on an account. A counterclaim sought damages for defective dairy feed. The trial court refused to permit evidence on the counterclaim of loss of calves through failure of the cows to conceive. There was evidence of declining milk production for two years. It was admitted without objection. The issue on appeal was whether Mr. Kempker should have been permitted to introduce evidence of lost calf production during 1982 and loss of milk production in two other years.

Although evidence was adduced from an expert witness concerning certain facets of the case, there was no expert testimony that the ingestion of the questionable feed caused a decrease in the production rate of Mr. Kempker's cows. ("Neither of Kempker's experts ... expressed any opinion going beyond suggestion that deficiencies in the feed supplied by MFA caused any decline in milk production, at any time." 726 S.W.2d at 727.) The record in *Kemp-*

*ker* did not reveal how long milk production would be affected after the defective feed was fed. There was no evidence in *Kempker* concerning when normal production would resume after any diet deficiencies were corrected. *Kempker* holds that expert testimony as to these matters was required in order to establish causation that would permit the calculation of damages.

In this case there was expert testimony that the problems plaintiffs' cattle experienced were caused by aflatoxin in feed that was purchased from and delivered by Hartville. There was expert testimony of causation that supported the calculation of damages by Mr. Cox and Mr. Thompson. Point II is denied.

■ Point III of Hartville's appeal is directed to the admission in evidence of deposition testimony of John Burkdoll and Mike Parker. Both are dairy farmers who had purchased feed from Hartville.

At the time of his deposition, Mr. Burkdoll had been a dairy farmer for 30 years. He started buying bulk feed from Hartville "about '93." During the time he fed feed that was purchased from Hartville, Mr. Burkdoll's cattle had decreased milk production, developed a poor appearance, sore feet and reproduction problems. He believed there was something wrong with the feed purchased from Hartville and discontinued feeding it "[m]aybe less than a year" after he had begun.

Mike Parker purchased feed from Hartville until April 1991. The last year or two he fed feed purchased from Hartville, his cattle experienced decreased milk production and developed reproduction problems, poor appearance and sickness. About "half a dozen cows" died. Mr. Parker testified that they would get sick and go "downhill"; they would waste away. Mr. Parker did not understand what was happening. He testified that he checked everything, had veterinarians look at his cows. He did things the same as he had

before, but the cows' milk production continued going down.

Point III asserts that the trial court erred in admitting, over Hartville's objections, the deposition testimony of John Burkdoll and Mike Parker. Point III argues it was error to permit the witnesses' deposition testimony "because plaintiffs failed to prove that the condition of their dairy herds were similar in circumstances to that of plaintiffs' dairy herd in that plaintiffs did not establish [John Burkdoll's and Mike Parker's] herd [sic] ate the same feed ration as plaintiffs', that they suffered from the same conditions from the same cause and that the conditions were present at the same time period."

Trial courts have wide discretion on issues of admission of evidence of similar occurrences. *Pierce v. Platte–Clay Electric Co-op., Inc.,* 769 S.W.2d 769, 774 (Mo.banc 1989). This Court's review is limited to whether the trial court determined that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues. *Id.* Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Anglim v. Missouri Pacific Railroad Co.,* 832 S.W.2d 298, 303 (Mo. banc), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). *Richardson v. State Highway & Transp. Com'n.,* 863 S.W.2d 876, 881 (Mo. banc 1993).

Evidence that cattle belonging to Mr. Burkdoll and Mr. Parker suffered similar consequences to those suffered by plaintiffs' cattle after eating feed formulated at the same mill as the feed plaintiffs fed to

their cattle would be probative of plaintiffs' claim that feed formulated by Hartville caused those consequences. *See Albers Milling Co. v. Carney, supra,* at 123. The conditions were sufficiently similar for the trial court to have concluded that the evidence was relevant and the occurrences bore sufficient resemblance to the harm plaintiffs' cattle suffered to permit the testimony. The circumstances before the trial court were such that its ruling was not illogical. Its ruling was not arbitrary or unreasonable so as to shock this court's sense of justice or indicate a lack of careful consideration by the trial court. Point III is denied.

Hartville's Points IV, V and VI allege trial court error in the admission in evidence of expert testimony. All three points are directed to testimony of Dr. Michael Gardner. Point IV is also directed to testimony of Dr. Dan Netemeyer. Points IV and V relate to the witnesses' qualifications to testify about aflatoxin. Point VI is directed to testimony of Dr. Gardner concerning experiences of farmers other than plaintiffs that plaintiffs asserted was corroborative of their claim that the losses they incurred were caused by aflatoxin.

 "Whether a witness' qualifications to state an opinion are sufficiently established rests largely in the discretion of the trial court and its ruling thereon will not be disturbed on appeal unless there is a clear showing of abuse." *Donjon v. Black & Decker (U.S.), Inc.,* 825 S.W.2d 31, 32 (Mo.App.1992). This court will not intervene with the trial court's exercise of that discretion unless it plainly appears the exercise of its discretion has been abused. *Id.*

In a civil action "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert

by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." § 490.065.1 RSMo 1986;[6] *McCutcheon v. Cape Mobile Home Mart, Inc.,* 796 S.W.2d 901, 906 (Mo.App.1990); *Eichelberger v. Barnes Hospital,* 655 S.W.2d 699, 704 (Mo.App.1983). In order for a witness to be qualified as an expert, it must be shown that by reason of education or specialized experience the witness possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or of drawing correct conclusions. *City of Ballwin v. Hardcastle,* 765 S.W.2d 324, 326 (Mo.App.1989).

*Id.* "The extent of an expert's experience or training goes to the weight of his testimony and does not render the testimony incompetent." *Id.* at 33.

 Point IV asserts that the trial court erred in permitting Dr. Gardner and Dr. Netemeyer to testify as experts "regarding the topic of aflatoxin ... because they did not have the requisite knowledge, skill and training or education to assist the jury on the subject matter of aflatoxin in that six months prior to trial Dr. Gardner did not consider himself an expert, and Dr. Netemeyer has never considered himself such an expert in said area...."

Dr. Gardner is a doctor of veterinary medicine. He obtained his Doctor of Veterinarian Medicine degree in 1967. He practiced ten years in New York before coming to Missouri. At the time of trial he practiced in Mountain Grove, Missouri. He characterized his practice as "[p]rimarily dairy practice." At the time of trial his practice was "80 percent dairy, 20 percent small animal." He was asked his diagnosis of what produced the problems experienced by plaintiffs' cattle. Dr. Gardner stated that his diagnosis, to a reasonable

---

6. The text of § 490.065.1, RSMo 1994, the current revision of the applicable statute, is unchanged from the revision in effect at the time *Donjon v. Black & Decker (U.S.), Inc.,* 825 S.W.2d 31 (Mo.App.1992), was decided.

degree of medical certainty, was "that it is aflatoxin coming from feed from the feed mill"; that he was convinced that was what was wrong with plaintiffs' herd in 1992.

Dr. Gardner testified that he had studied aflatoxin extensively and believed he was qualified to render opinions as to the nature, cause and results of aflatoxin. He had studied articles and scientific papers by experts in the field, attended meetings on aflatoxin and worked with other herds affected by aflatoxin. Dr. Gardner stated those were accepted methods of learning for veterinarians.

Hartville contends Dr. Gardner's expert testimony about aflatoxin should not have been admitted in evidence "in that six months prior to trial Dr. Gardner did not consider himself an expert." Dr. Gardner testified that he had begun his study of aflatoxin August 27, 1997. Dr. Gardner received some articles on aflatoxin from plaintiffs' attorneys. He stated, "I received articles from other people and as a veterinarian I read books on toxicology. I got one from Dr. Hubner, I got some from Dr. Ehlers, I've researched." He testified that his opinions were based on articles and journals he had studied and on conversations and research. He had seen another veterinarian's, Dr. Ehlers, medical report on plaintiffs' herd and a feed sample report based on a feed sample from Hartville collected by Mr. Sanders. He stated he relied on all of those things in forming his opinion. The trial judge concluded that Dr. Gardner was an expert capable of testifying about aflatoxin in plaintiffs' cattle. The trial judge acknowledged that the challenges Hartville posed to Dr. Gardner's qualifications were "fair game for cross-examination and for rebuttal."

■ "The trial court has discretion to determine an expert's qualifications to testify on specific matters." *Wingate by Carlisle v. Lester E. Cox Medical Center,* 853 S.W.2d 912, 918 (Mo. banc 1993), citing *Parlow v. Dan Hamm Drayage Co.,* 391 S.W.2d 315, 325 (Mo.1965). *See also By-note v. National Super Markets, Inc.,* 891 S.W.2d 117, 125–26 (Mo. banc 1995). The qualifications of a witness testifying as an expert are determined at the time the individual is offered as a witness. *Albers Milling Co. v. Carney, supra,* at 122. The time and manner in which Dr. Gardner acquired his expertise regarding aflatoxin and its effects went to the weight of his testimony and not to his competency to testify as an expert on that subject. *See State v. Hart,* 805 S.W.2d 234, 238 (Mo. App.1991). "The test of expert qualification is whether he has knowledge from education or experience which will aid the trier of fact." *Id.* This court finds no abuse of discretion by the trial court in concluding Dr. Gardner was an expert for purposes of testifying on the subject of aflatoxin.

■ Dr. Netemeyer has an undergraduate degree and a Ph.D. degree in dairy nutrition. He is the nutritionist for MFA. He had been employed by MFA for 16 years at the time of trial. His duties with MFA included farm relation program development and making feeding guideline recommendations. His work includes dealing with aflatoxins. He advises MFA's 12 mills about problems with aflatoxins. As a nutritionist, he has studied aflatoxins. Dr. Netemeyer wrote MFA's quality control manual on aflatoxins. When MFA'S mills experience problems with aflatoxins, he is the person who is called.

Dr. Netemeyer testified that he had the expertise and possessed qualifications that enabled him to render opinions about how aflatoxins grow, how to test for them and what they do to feed. He testified about standard mill practices and what types of practices would increase the likelihood of mold developing in feed. The trial court did not abuse its discretion in permitting Dr. Netemeyer to testify as an expert on the subject of aflatoxin and how it is affected by mill practices. Point IV is denied.

■ Point V contends the trial court erred in permitting Dr. Gardner's testimony regarding the topic of aflatoxin because

Dr. Gardner, in diagnosing aflatoxin, relied on information other than results of tests of grain used in feed and tests of the cattle that experienced harm as a result of ingesting aflatoxins. Hartville argues that the facts upon which Dr. Gardner based his opinion were not facts or data of the type experts in the field reasonably relied upon in reaching opinions. Hartville presented testimony of Dr. Stan Casteel, Dr. David Hardin, Dr. Max Thornsberry, Jr., and Ted Probert in response to Dr. Gardner's testimony.

Dr. Casteel is a doctor of veterinary medicine. He also holds a Ph.D. degree in toxicology. He is a member of the faculty at the University of Missouri School of Veterinary Medicine. Dr. Casteel was asked what would be looked at to determine if aflatoxin caused an animal's death or ill health. He stated that he would examine the feed for the presence of mycotoxin and at the "target organ." He said the target organ was primarily the liver. Dr. Casteel observed, however, that if an animal affected by aflatoxin survived, a subsequent biopsy of the liver might not reveal aflatoxin. He explained, "[I]f the animal were to live over that acute insult, the liver because of its regenerative capacity could largely repair itself." It was Dr. Casteel's belief that if a cow died from aflatoxin, it should be discernable by a pathological examination of the liver.

Dr. Casteel was asked if the evidence that was available suggested that plaintiffs' herd had been affected by aflatoxin at any time. He answered that he was not prepared to make a conclusion; that he had not reviewed all of the information concerning the case.

Dr. Hardin is a veterinarian. He had been herd veterinarian at one time for plaintiffs' herd. He opened a private practice in the area where plaintiffs' farm is located shortly after he graduated from veterinarian school in 1977. Dr. Hardin left practice in 1981. He returned to the University of Missouri to enter a residency program. At the time of trial, Dr. Hardin was employed by the University of Missouri as director of veterinary extension continuing education. He had been contacted by plaintiffs in 1993 because plaintiffs were not satisfied with their milk production and plaintiffs' cows were not breeding satisfactorily. He visited plaintiffs' farm. He did not test for aflatoxin. The records of his visits noted "[a] reasonable estimate ... that approximately two-thirds of the cows were below the expected body condition for their stage of lactation." Dr. Hardin was asked to explain what this meant. He answered, "I was finding thin cows." He said he "leaned" on his nutrition colleagues to work on the nutrition program. Dr. Hardin testified that the possibility of aflatoxin toxicity was investigated; that four cows were selected for liver biopsy. The four cows were cows that had been in the herd when production began to fall. He stated that the biopsy reports gave no evidence of liver damage.

Dr. Hardin said he had been asked to look into the question of whether aflatoxin or mycotoxin could have been the cause of problems plaintiffs had observed in their herd. He said he told the people who made the request of him that the trail was pretty cold; it would be very difficult to reach any conclusion. He stated he could not form a conclusion within a scientific certainty as to what may have caused any problem in 1991 or 1992.

Dr. Max Thornsberry, Jr., testified by deposition as a witness for Hartville. He is self-employed. The name of his business is Mid American Veterinary Consulting and Avanco Feed Company. He stated that his business does basic consulting for food animal medicine; that he consults with individual dairymen and livestock raisers. He does some consulting for feed companies and industry related projects. He said he had worked "as a nutritional consultant since 1992." Dr. Thornsberry has a veterinary medicine degree and a M.B.A. degree. He visited plaintiffs' farm in 1994 after Dr. Hardin had contacted him. At that time plaintiffs thought the

feed was the problem with their cattle. Dr. Thornsberry said the problem plaintiffs thought existed was that "[t]he feed was being taken somewhere and the fines being repelleted, and he was being given the fines back as feed."

Dr. Thornsberry discussed various symptoms of disease and what could produce them. His conclusion from his review of the circumstances in 1994 was that the only problem suggested was "a rumen acidosis problem, not an aflatoxin problem." He admonished, however, that he "did not see any of these cattle when they were exhibiting clinical symptoms."

Ted Probert testified by deposition. His testimony was offered by Hartville. He holds a B.S. degree in dairy husbandry and a Masters degree in dairy reproductive physiology. He works as an extension dairy specialist for the University of Missouri. His office is in Hartville, Missouri. His work encompasses Wright, Douglas and Ozark Counties. Mr. Probert assisted in getting personnel from the University of Missouri to come to plaintiffs' farm and consult with plaintiffs. He testified that plaintiffs reviewed a file he maintained in his office regarding incidents of aflatoxin. When the possibility of aflatoxin being a problem was discussed with him, Mr. Probert suggested the best option to follow in exploring that as a possibility would be to get the feed the cattle were consuming analyzed. Mr. Sanders told him the circumstances about which he was concerned had been in the past. For that reason the possibility of getting a sample would be difficult. Mr. Probert explained, "Well, the feed was from, I mean that was after the fact on the feed, the feed was gone." Mr. Probert had no opinion about whether the problems plaintiffs described was a result of aflatoxin.

Point V complains that because the feed plaintiffs acquired from Hartville had not been tested nor had there been biopsies or other pathological test results of cattle showing aflatoxin, Dr. Gardner should not have been permitted to express an expert opinion on the subject of aflatoxin. Hartville's argument that it was error to permit Dr. Gardner to testify about aflatoxin is based on other experts' testimony that for them to testify concerning the presence of aflatoxin, they would require tests of feed that was being consumed or biopsies from cattle believed to be affected.

Dr. Gardner acknowledged that aflatoxacosis is difficult to diagnose; that several of its symptoms are also symptoms of other diseases. He stated that if he had been more familiar with aflatoxin when he was treating plaintiffs' herd from 1990 through 1992, he would have tested feed the cattle were consuming and had biopsies performed. Dr. Gardner pursued more information about the effects of aflatoxin after he ceased being plaintiffs' herd veterinarian. Based on Dr. Gardner's evaluation of the symptoms plaintiffs' herd demonstrated and the additional knowledge he acquired concerning aflatoxin, Dr. Gardner concluded the problems plaintiffs' cattle experienced were caused by aflatoxin in their feed. Dr. Gardner was asked, as an expert, if he believed he was "qualified ... to render opinions as to the nature of aflatoxin, the cause of aflatoxin, the results of aflatoxin." He stated that he was.

Dr. Gardner concluded that the symptoms he observed in plaintiffs' cattle were attributable to aflatoxin in their feed. He did this after eliminating numerous other potential causes. He considered the information he had concerning plaintiffs' cattle sufficient to support his diagnosis. "The trial judge is expected to defer to the expert's assessment of what data is reasonably reliable." *Wulfing v. Kansas City Southern Industries, Inc.,* 842 S.W.2d 133, 152 (Mo.App.1992). Questions concerning the sources and bases of an expert's opinion affect the weight rather than the admissibility of the opinion. *Id.* They are credibility issues properly left to the jury. *Id.* Point V is denied.

Point VI is directed to testimony by Dr. Gardner about other farmers'

herds. Hartville contends the trial court erred in permitting Dr. Gardner to testify about the condition of other herds for purposes of corroborating that the illnesses plaintiffs' cattle experienced were caused by feed acquired from Hartville. Hartville argues "that plaintiffs did not establish the farmers' herd ate the same feed ration as plaintiffs', that they suffered from the same conditions from the same cause and that the conditions were present at the same time period."

Dr. Gardner testified about other herds where he observed symptoms similar to those he observed in plaintiffs' herd. He identified four herds, those of Mike Parker, Earl Nelson, Danny Malanovich and Joe Stradling, as herds that had been fed feed acquired from Hartville.

Although Point VI, as this court perceives it, is directed generally to Dr. Gardner's reference to illnesses in other herds, one segment of Hartville's argument is directed to the admissibility of specific testimony elicited from Dr. Gardner regarding Joe Stradling's dairy herd. Hartville complains in the argument portion of its brief directed to Point VI that Dr. Gardner "was permitted to testify that based upon a 'reasonable degree of veterinary medical certainty, that both the Stradling's [sic] and [plaintiffs] got aflatoxin in their feed.'" Hartville argues that this testimony should not have been allowed because "plaintiffs failed to lay a proper foundation establishing 'similar circumstances'...." The question and answer about which Hartville complains were:

> Q. [by plaintiffs' attorney] Based on the fact that they had the same or similar problems, around the same time, even though the Stradling's [sic] had more acute problems and suffered more initial cow loss, is it your opinion to a

reasonable degree of veterinary medical certainty, that both the Stradling's [sic] and [plaintiffs] got aflatoxin in their feed?

> A. Yes, it is.

■ Plaintiffs' attorney advised Hartville's attorney that he had no further questions of the witness. Hartville's attorney told the trial court he was going to resist the urge to ask the last question; that he had no more questions. Hartville's attorney did not object to the question Hartville now attempts to challenge.[7] Any allegation of error in the admission of Dr. Gardner's answer in evidence may not now be raised on appeal. *Liszewski v. Union Elec. Co.*, 941 S.W.2d 748, 752 (Mo.App. 1997).

The gist of Point VI, however, is directed to overall references during parts of Dr. Gardner's testimony to illnesses he had observed in herds other than plaintiffs'. Hartville contends this was an effort to corroborate that plaintiffs received contaminated feed from it; that the evidence was improperly admitted because "plaintiffs did not establish the [other] farmers' herd [sic] ate the same feed ration as plaintiffs', that they suffered from the same conditions from the same cause and that the conditions were present at the same time period."

■ This court does not conclude, in its reading of the excerpts of Dr. Gardner's testimony to which Hartville directs its complaint in Point VI, that the references by Dr. Gardner to illnesses experienced by other herds were intended to demonstrate that feed acquired from Hartville caused those illnesses. Dr. Gardner testified that he had observed symptoms of aflatoxin in herds other than plaintiffs' and that he had diagnosed aflatoxin in other

---

7. The question was asked during redirect examination of Dr. Gardner. An objection was made before this question had been asked concerning the scope of plaintiffs' redirect examination. Hartville had objected that the redirect examination was beyond what Hartville's attorney "went through on cross." That objection was overruled. That ruling has not been challenged in this appeal. Issues on appeal are reviewed only on the theory that was presented to the trial court. *Schmidt v. Warner*, 955 S.W.2d 577, 584–85 (Mo.App.1997).

**210**

herds. Dr. Gardner did not know the source of some of the feed the other farmers had purchased. The events about which Dr. Gardner testified, and to which Hartville takes exception in Point VI, were part of Dr. Gardner's professional experience. The testimony provided part of the basis for the trial court to permit Dr. Gardner to testify as an expert with respect to aflatoxin. "Any expert witness represents the distillation of the total of his personal experiences, readings, studies and learning in his field of expertise, and he may rely on that background ... as basis for his opinion." *State v. Woodworth,* 941 S.W.2d 679, 698 (Mo.App.1997). The evidence concerning other herds with which Dr. Gardner was familiar was part of his personal experience and learning in his field of expertise. It was part of the background on which he relied in forming his opinion concerning plaintiffs' cattle. Point VI is denied.

■ Point VII asserts that the trial court erred in admitting testimony of Dr. Gardner that expressed "new opinions" concerning Hartville's practice of using "black light testing" to test for aflatoxin in corn. Point VII suggests that "new opinions" subjected it to "trial by ambush." Hartville's brief complains:

On October 8, 1997, six months prior to trial, Dr. Gardner represented in his final deposition that he had provided all of his opinions relevant to [plaintiffs'] case. Specifically, with regard to criticisms of [Hartville's] practices, Dr. Gardner cited only the "practice" of unloading corn in the rain, the "practice" of allowing several employees to test the corn for moisture content and the "practice" of having too many "mix masters" at the mill as poor management on behalf of [Hartville]. When asked if Dr. Gardner had any other criticisms of [Hartville], he indicated that he had no others. [Page reference to record on appeal omitted.]

Notwithstanding the above specific questions and answers as to opinions of [Hartville's] mill practices, plaintiffs were permitted to elicit "new opinion" testimony of Dr. Gardner regarding [Hartville's] practice of utilizing the "black light" test in testing for aflatoxin in corn. Clearly, this was a "new opinion" and should not have been permitted.

Dr. Gardner was asked at trial to identify tests that could be used to determine the presence of aflatoxin in corn before it is manufactured into feed products or sold. He began his answer, "Okay. Utlraviolet light is one. It's not a very good one. All articles will say that it's—there's too many—." Hartville's attorney objected, "With regard to the black light test versus chemical tests, he has never expressed any opinion in the three depositions we took and I did ask him if he had any opinion as to malpractices and he did testify unloading in the rain and things like that so we can't call surprise on that, but—."

A discussion ensued between the attorneys and the trial court. The trial judge suggested that the witness could testify about different ways of testing. Plaintiffs' attorney told the court, "I'll instruct him not to give his opinion." The trial judge replied, "Okay. As far as going into the other, that's fine. Objection sustained." The examination of Dr. Gardner continued. He was told not to give an opinion as to different tests; to just describe how the black light test worked.

Dr. Gardner described how a black light test would disclose the presence of mold in corn. He was asked about other tests. He said there was a "TLC", a "thin layer comptography" test. He started to describe how it worked when Hartville's attorney again approached the bench. Following a bench conference, plaintiffs' attorney was told to stick to the general description of how to test unless he could qualify the witness as a chemist. Following further colloquy, Dr. Gardner identified an "Eliza" test that he characterized as "an antibody test."

Dr. Gardner was then asked if he had done field tests about the difference in aflatoxin in two different handfuls of feed. Hartville's attorney again engaged in a discussion with the trial judge and other trial attorneys concerning the substance of the question that had been asked. Although no objection was posed, the trial judge stated he saw no harm; that he was "going to let it in." He announced, "Overruled."

Hartville, in its Point VII characterizes these events as a circumstance in which "an expert witness has been deposed and later changes an opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition." On that basis Hartville asserts that plaintiffs had a duty to disclose the "new information" to which Dr. Gardner testified in order to update Dr. Gardner's responses in the deposition. *See Green v. Fleishman,* 882 S.W.2d 219, 221–22 (Mo. App.1994).

■ It is questionable that the testimony to which Hartville objected at trial amounted to the making of additional criticisms of Hartville's milling practices or to the giving of "new opinions" within Dr. Gardner's identified field of expertise. Nevertheless, assuming, without deciding, that Hartville's contention that Dr. Gardner's trial testimony went beyond the scope of his deposition testimony with respect to criticisms of Hartville's milling practices, Point VII fails. The trial court is vested with broad discretion in determining if a remedy is appropriate when a party fails to properly disclose or update an expert's responses given in discovery. *Blake v. Irwin,* 913 S.W.2d 923, 931 (Mo. App.1996). In this instance the trial court limited Dr. Gardner's trial testimony on this subject to discussing tests in general and prohibited him from giving opinions as to whether a particular test was good or bad. The trial court's action was not against the logic of the circumstances before it. Its actions in ruling as it did were not arbitrary or unreasonable so as to

shock this court's sense of justice or indicate a lack of careful consideration. There was no abuse of discretion. Point VII is denied.

■ Point VIII is directed to the deposition testimony of Donald Barr, a former employee of Hartville. Mr. Barr testified about milling practices he observed during his employment by Hartville. Hartville contends it was error to permit Mr. Barr to testify because he was not an employee during the time the alleged illnesses to plaintiffs' cattle occurred; that his testimony "was not relevant, lacked probative value and was highly prejudicial." The reading of Mr. Barr's deposition was objected to on these bases. The trial court overruled the objection.

Donald Barr worked for Hartville for 18 years. His employment with Hartville ended the week of March 19, 1989. At the time he gave his deposition, Mr. Barr was self-employed.

Mr. Barr testified that during his employment by Hartville he would accept or reject loads of corn on behalf of Hartville. He said there were two tests that he performed on loads of corn that were received, a moisture test and a test for aflatoxin. He explained that the moisture test was performed on samples taken from several different places in a load of corn. There was a maximum moisture content that was acceptable. There was also a minimum acceptable level. He testified that the lower moisture content affected how the corn reacted when it was crushed, "If you go down 8 percent, it will just pulverize, if you have—there's rollers, and you have to readjust your rollers."

Donald Barr was asked if he was working at Hartville when it "got the black light or blue light." He said he was. He testified that his instructions had been to reject a load if there was any glow or sparkle or light, "[i]f it's that much." He was asked the following questions and gave the following answers:

Q. Okay. If there's one little speck?

A. Well, we have to go through and take the samples.

Q. Okay.

A. You could have a tolerance of so much.

Q. Okay.

A. It was pretty slim, I know that.

Q. Okay. But if there could be some specks or some glows, and if it was a few, you—

A. I have tested some that came through there that just looked like a Christmas tree had been lit up.

Q. Okay.

A. And there's no question on that.

Q. You rejected that load?

A. Yes.

Q. You didn't need to go to Donnie [Hudson]?

A. No, there was no need in it.

Q. But there would be a range of between the Christmas tree effect and just one or two specks, what would you do if it was—

A. Well, I think we took—got to where—like I say, it has been a long time ago, but I think we would even take a knife and bust them up a little bit.

Q. Okay.

A. To see if there was any inside of it or something like that.

Q. So as I understand it, you're kind of saying it became a judgment call?

A. Well, you have to call judgment sometime.

Q. Right. Right.

A. Whether you take it or not.

Mr. Barr testified that if there were any "glowers," Donnie Hudson, the mill manager, would have to see it. He was asked if Hartville would accept a load of corn when there were glowers. He answered, "Not that I know of."

Mr. Barr was asked and answered questions concerning repelleted fines:

Q. During that time you were repelleting fines, would you ever go as long as two months without having a load?

A. I don't know if we went that long, we might have.

Q. Okay. Did you ever show some of the repelletized pellets to Mike Hensley and ask him if he would feed those to his cattle?

A. Probably joking, I probably did.

Q. And by that you meant you wouldn't want to do that?

A. Well, you know, a lot of times it become a big joke, you know, "We've got some repelletized pellets here," you know, and it would be a big joke.

Q. But what you said to him was, "You wouldn't want to feed these," or, "Would you want to feed these to your cattle?"

A. Well, when it gets to be a joke—

Q. But the point of the joke was that they were inferior to the original pellets?

A. Well, we assumed they was, yes.

Mr. Barr explained that the problem he considered with respect to repelleted fines was "[i]t was softer, it was a little bit softer pellet." He was asked, "So it was more form over substance in the pellet sense?" He answered, "Yeah."

■ Evidence of business custom and practice is admissible in civil actions as evidence that the practices that were regularly employed in the past occurred with respect to the subsequent event in question. *See Division of Youth Services v. Hopson,* 933 S.W.2d 917, 919 (Mo.App. 1996); *Miles Homes v. First State Bank,* 782 S.W.2d 798, 802 (Mo.App.1990); *First Nat'l Bank v. Mid–Century Ins. Co.,* 559 S.W.2d 50, 52 (Mo.App.1977). The trial court did not err in permitting Mr. Barr's deposition testimony concerning the methods Hartville employed in testing corn it received.

■ As to Mr. Barr's testimony concerning repelleted feed, his testimony

revealed that Hartville had knowledge that its repelleted pellets were inferior in form if not necessarily in quality. Whether relevant or not to the issues in this case, this court finds no prejudice to Hartville from Mr. Barr's testimony concerning the effect of repelleted feed, that it was softer than original pellets. Even if error occurs in the admission of evidence, it is not grounds for reversal if it is not prejudicial. *Riley v. Union Pacific R.R.*, 904 S.W.2d 437, 443 (Mo.App.1995); *Vasseghi v. McNutt*, 811 S.W.2d 453, 456 (Mo.App.1991). As to the testimony concerning fines accumulating before being repelleted, there was other evidence that storing fines for repelleting increased the chance of mold forming that would become part of repelleted feed. Mr. Barr's testimony as to that matter was relevant. Point VIII is denied.

■ Point IX is directed to the trial court permitting plaintiffs to amend their petition during trial.[8] During Thomas Sanders' testimony he was asked questions about damages to plaintiffs' beef cattle. Hartville objected that damage to beef cattle was beyond the scope of plaintiffs' pleadings. Plaintiffs sought leave to amend its pleadings to include a claim for damages for harm done to their beef cattle. Hartville contends the trial court erred in permitting the amendment; that it abused its discretion because Hartville was not afforded an opportunity to discover, depose and rebut the assertion that plaintiffs' beef herd was damaged. For that reason, Hartville argues it was prejudiced by the trial court's action.

■ Rule 55.33(a) addresses the amendment of pleadings. A pleading to which a responsive pleading is required may be amended, after the responsive pleading has been filed, with leave of court. Rule 55.33(a) provides, "[L]eave

shall be freely given when justice so requires." "The decision of the trial court to allow an amendment of a pleading after trial has commenced is a discretionary matter which we will not overturn unless that discretion has been clearly abused." *Nieberg Real Estate Co. v. Taylor–Morley–Simon, Inc.*, 867 S.W.2d 618, 625 (Mo. App.1993).

Hartville's attorney proclaimed surprise during the testimony of economist Larry Cox about losses related to plaintiffs' beef cattle. That surprise was expressed as "a total surprise with regard to the petition and how it was pled." The trial judge inquired whether the witness had testified about damages related to the beef cattle during the witness' deposition or whether the topic was something new. Hartville's attorney acknowledged that the chart the witness used to itemize damages had existed since March 1997 (the trial commenced February 23, 1998). In ruling on the matter the trial judge stated he did not think there was any surprise; that "its [sic] fair to let the jury consider it." The trial court did not abuse its discretion. Point IX is denied.

■ Points X and XI are directed to two verdict-directing instructions that were read to the jury, Instruction No. 6 and Instruction No. 8. Point X claims Instruction No. 6 was erroneous. Point XI asserts error in giving Instruction No. 8.

Point X alleges there was no substantial evidence to support the findings required by Instruction No. 6.[9] It further alleges that because the instruction did not reference aflatoxin or aflatoxin poisoning, it was vague so as to give the jury a "roving commission."

Instruction No. 6 is patterned precisely after MAI 25.02 [1981 Revision]. Rule 70.02(b) provides, "Whenever Missouri Ap-

---

8. Count I of plaintiffs' second amended petition, on which the case was tried, alleged damages to plaintiffs' "dairy animals." It was amended to allege damages to plaintiffs' "herd, including lactating dairy cows, stock and beef cattle, calves, and dry cows."

9. Instruction No. 6 is quoted in the part of this opinion that addresses Hartville's Point I.

proved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." Hartville's assertion that the instruction was erroneously vague is denied. Instruction No. 6 was in the form mandated by MAI 25.02.

As discussed at length with respect to Point I of Hartville's appeal, there was substantial evidence to support plaintiffs' product liability claim, its Count I. That is the claim to which Instruction No. 6 is directed. Point X is denied.

■ Point XI asserts that there was not substantial evidence to support Instruction No. 8.[10] It argues that the instruction was vague and thereby gave the jury a roving commission because it assumed a disputed fact, that any level of aflatoxin in feed caused it to be considered contaminated.

Rule 70.03 requires trial counsel to make specific objections to instructions considered erroneous. It prohibits assignment as error the giving of an instruction unless objection is made before the jury retires to consider its verdict. An objection to an instruction must state distinctly the matter objected to and the grounds of the objection. Hartville did not object to Instruction No. 8 on the basis that it erroneously assumed any level of aflatoxin would cause the problems plaintiffs' cattle experienced. Because Hartville failed to object to the instruction on that ground this court will not now review the claim. *Blackstock v. Kohn,* 994 S.W.2d 947, 953 (Mo. banc 1999).

The discussion of Point I addresses Hartville's contention that Instruction No. 8 was not supported by the evidence and finds otherwise. Point XI is denied.

■ Hartville's Point XII asserts that the trial court erred in awarding plaintiffs

prejudgment interest because plaintiffs failed to comply with requirements of § 408.040[11] in that plaintiffs' demand letter was not sent by certified mail and failed to allege the claim plaintiffs asserted at trial.

■ The general rule is that prejudgment interest is not allowed in tort cases. *Emery v. Wal-Mart Stores, Inc.,* 976 S.W.2d 439, 449 (Mo. banc 1998). Section 408.040.2 provides, however:

In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest ... shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier. Nothing contained herein shall limit the right of a claimant, in actions other than tort actions, to recover prejudgment interest as otherwise provided by law or contract.

Plaintiffs sent a letter to Hartville offering settlement of this lawsuit. Hartville did not accept the offer. The letter was not sent by certified mail. *Emery* addresses the effect of failing to send a demand or offer by certified mail:

[W]hen statutory language is clear, courts must give effect to the language as written. Courts are without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language. *M.A.B. v. Nicely,* 909 S.W.2d 669 (Mo. banc 1995). The court should regard the statute as meaning what it says. *State ex rel. Bunker Resource, Recycling and Recla-*

---

10. Instruction No. 8 is quoted in the part of this opinion that addresses Hartville's Point I.

11. References to § 408.040 are to RSMo 1994.

*mation, Inc. v. Dierker,* 955 S.W.2d 931 (Mo. banc 1997). A court may not add words by implication to a statute that is clear and unambiguous. *Asbury v. Lombardi,* 846 S.W.2d 196 (Mo.banc 1993).

. . .

Section 408.040.2 is clear and requires certified mail. Since plaintiff's letter was not sent by certified mail, the trial court correctly denied prejudgment interest. . . .

976 S.W.2d at 449–50.

Point XII is well taken. The trial court erred in awarding prejudgment interest because the letter in which the offer of settlement was sent was not by certified mail. This court need not address Hartville's further claim in Point XII that the claim the letter offered to settle was a different claim than the one for which judgment was entered.

 Plaintiffs' response to Point XII erroneously argues that Hartville abandoned and failed to present its claim that prejudgment interest was not allowed due to plaintiffs' failure to send their settlement offer by certified mail. Plaintiffs contend Hartville's motion for judgment notwithstanding the verdict or alternative motion for new trial did not raise that issue. That argument is without merit. Paragraph 16 of Hartville's motion specifically asserts that the trial court erred in awarding prejudgment interest pursuant to § 408.040 because plaintiffs did not send a letter in compliance with the statutory requirements of that statute. Further, in its written argument to the trial court prior to the trial court's ruling on Hartville's motion and during the time the trial court had the issue of whether to award prejudgment interest under advisement, Hartville argued to the trial court that plaintiffs' letter had not complied with the statutory requirements that it be sent by certified mail.

The trial court awarded prejudgment interest in the amount of $127,130. That part of the judgment will be reversed.

### *Plaintiffs' Appeal – No. 22446*

Plaintiffs' cross-appeal is directed to issues related to the trial court's award of summary judgment for Cargill, Inc., on all counts of plaintiffs' petition and summary judgment for Hartville on all counts other than Counts I and IV. Plaintiffs' appeal, however, is pursued only if this court did not "uphold the judgment based on the jury verdict." It is, therefore, moot.

### *Disposition*

The judgment is reversed as to the award of prejudgment interest. In all other respects the judgment is affirmed. The case is remanded to the trial court with directions to enter judgment consistent with this opinion.

CROW, P.J., and SHRUM, J., concur.

### *ON MOTIONS FOR REHEARING AND/OR TRANSFER TO THE SUPREME COURT*

PER CURIAM.

Thomas Sanders and Helen Sanders (plaintiffs) filed a motion for rehearing before this court. Hartville Milling Company (Hartville) filed a motion for rehearing and alternative motion to transfer to Supreme Court of Missouri. The motions are denied. An issue in plaintiffs' motion warrants comment in that the rationale relied on in their argument misconstrues when a judgment is final and, therefore, when post-trial motions are timely.

Plaintiffs' motion for rehearing is directed to the part of the judgment that was reversed, the award of prejudgment interest. Plaintiffs rely on piecemeal rulings on issues in the case rather than on the disposition of all pending issues that were before the trial court in asserting Hartville's

post-trial motion was filed out of time, more than 30 days after entry of judgment. *See* Rules 72.01(b) and 78.04.[1]

Plaintiffs filed an 11-count petition against Hartville and "Cargill–Nutrena," a division of Cargill, Inc. (Cargill). On March 26, 1998, the trial court entered a "Memorandum Opinion and Order" that concluded, "It is therefore ORDERED, ADJUDGED and DECREED that Defendant Cargill shall have judgment in its favor and against Plaintiffs on all counts of Plaintiffs' First Amended Petition and shall have judgment against Plaintiffs for its taxable costs."

A Second Amended Petition had been filed by plaintiffs. The trial court concluded that the reference to the First Amended Petition in its March 26, 1998, document was a clerical error. On October 27, 1999, the trial court entered an order "pursuant to Rule 74.06(a) and leave granted by the Missouri Court of Appeals, Southern District," correcting the clerical error. The October 27, 1999, document states, "It is therefore ORDERED, ADJUDGED and DECREED that Defendant Cargill shall have judgment in its favor and against Plaintiffs on all counts of Plaintiffs' Second Amended Petition and shall have judgment against Plaintiffs for its taxable costs."

Counts I and IV were tried before a jury.[2] Copies of docket sheets that are included in the legal file reflect a docket entry dated "3–3–98" that states, "Motion for Directed Verdict At The Close Of All Evidence filed by Defendant. Jury Instructions and Verdict form, signed by 9 Jurors filed." A docket entry dated "3–11–98" states, "Trial Minutes signed by Judge John Moody filed."[3]

A docket entry dated "3–20–98"states, "Judgment signed by Judge John Moody filed. (faxed copy) [sic] Certified copy of said Judgment was mailed to attorneys Gammon, Sweeney and Condry and Lowry on 3–23–98." A docket entry dated "3–23–98" states, "Judgment signed by Judge John Moody filed. (original signature)" [sic].

Neither the "Trial Minutes" nor the "Judgment" that was filed March 23, 1998, ruled on the issue of prejudgment interest. The "Judgment" filed March 23, 1998, disclosed it was taking "under advisement any award of prejudgment interest." The trial court did not rule on the prejudgment interest issue until June 30, 1998. A further "Judgment" was filed. It disclosed that the award of prejudgment interest had been "previously taken under advisement." It states that the trial court "now having ruled that issue in Plaintiffs' favor, Plaintiffs are awarded $127,130 in prejudgment interest." The June 30, 1998, "Judgment" is in favor of plaintiffs and against Hartville "on Counts I and IV . . . in the amount of $529,130.00, together with interest thereon after the date of judgment at the rate of nine percent (9%) per annum." Costs were taxed against Hartville. The June 30, 1998, "Judgment" concluded, "SO ORDERED, Nunc Pro Tunc, this 20th day of March, 1998." It was signed by the trial Judge.

 Hartville's motion for judgment notwithstanding the verdict or alternative motion for new trial was filed April 20, 1998. Plaintiffs' erroneously argue that the "Judgment" to which it was directed was rendered March 11, 1998, the date the trial judge filed the "Trial Minutes" that bore his signature. Because the April 20,

---

1. References to rules are to 1998 Missouri Rules of Court.

2. The trial court had previously granted Hartville's motion for summary judgment as to the other counts of the petition.

3. The March 11, 1998, trial minutes state only that the trial court "accepts verdict and enters judgment for Plaintiff on Court [sic] I and Court [sic] IV for $402,000.00." It includes no ruling on plaintiffs' claim for prejudgment interest.

1998, filing was more than 30 days following March 11, 1998, plaintiffs contend it was not timely filed. Rule 78.04 requires, "A motion for new trial shall be filed not later than thirty days after the entry of the judgment on a jury verdict, except as provided in Rule 74.01(b)." Rule 72.01(b) addresses motions for judgment notwithstanding the verdict. It provides, "Not later than thirty days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict." It permits a motion for new trial to be joined with the motion for judgment notwithstanding the verdict or in the alternative to that motion.

Rule 74.01(b), to which Rule 78.04 refers, provides that in the absence of the trial court having entered judgment as to one or more but fewer than all claims or parties in an action and having made the determination that there was no just reason for delay in entering judgment, "any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action." Any such "order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

The judgment that adjudicated the last of the pending issues was entered June 30, 1998. Hartville's motion was filed April 20, 1998. At that time the trial court had pending the issue of prejudgment interest. Hartville's motion addressed that issue even though at the time the motion was filed, the issue had not been finally decided. In that regard it was, arguably, premature. Nevertheless, it was filed "not later than thirty days after the entry of the judgment on a jury verdict....," Rule 78.04, and, as provided by Rule 72.01(b),

"[n]ot later than thirty days after entry of judgment...." Plaintiffs' claim that Hartville's post-trial motion was not timely filed is without merit.

The use of fragmented rulings erroneously denominated as judgments is a practice that trial courts should avoid. The uncertainty that may result in complicated cases is illustrated by the facts in this case.

Where separate trials are not ordered in cases with multiple claims and parties, there should be one final judgment that disposes of all parties and all issues. *M.F.A. Central v. Harrill*, 405 S.W.2d 525, 530 (Mo.App. 1966). In *Watson v. Moore*, 983 S.W.2d 208 (Mo.App. 1999), this court suggested:

> In formulating a judgment in a multi-court case, it is helpful to identify the specific counts presented by the pleadings and enunciate particular findings with respect to each count. It is likewise helpful if a judgment's decretal pronouncements identify with particularity the claim adjudicated by each pronouncement. Judgments fashioned in this manner assist in ascertaining whether all claims of all parties have been determined.

*Id.* at 209. Had the admonitions of *M.F.A. Central* and *Watson* been heeded in this case, its determination on appeal would have been less difficult.